UNITED STATES of America ex rel.
Anthony BRUNO, Petitioner,

v.

Ross E. HEROLD, M.D., Director of Dan-
nemora State Hospital, Dannemora,
New York, Respondent.

Civ. No. 10155.

United States District Court
N. D. New York.

July 20, 1967.

F. Redmond Griffin, Troy, N. Y., for petitioner.

Louis J. Lefkowitz, Atty. Gen. of New York, Albany, N. Y., for respondent. Joel Lewittes, Joseph R. Castellani, Iris A. Steel, Asst. Attys. Gen., of counsel.

JAMES T. FOLEY, District Judge.

## MEMORANDUM–DECISION AND ORDER

After considerable experience for many years with prolonged habeas corpus proceedings involving State prisoners of New York, it seems this present one may have been drawn-out for the longest period. I have written three decisions setting forth my viewpoints, findings and conclusions upon the question presented which from the beginning impressed me as one of consequence. Such feeling of substance remains to this date. All Judges, I suppose, being human, are inclined to be opinionated, stubborn and prideful about their previous views. I have the same fault, but have not been always unbending. (See United States ex rel. Kiernan v. LaVallee, (NDNY), 191 F.Supp. 455, 460).

The sole question involved is what I thought was the arbitrary and wrongful exclusion of the general public from a criminal trial held in Brooklyn in 1947. Such exclusion, in my judgment, after conscientious review, was without justification or support in the record for such drastic action. My philosophy as to the restraint to be exercised by federal judges in the intrusion of federal habeas corpus to upset old state convictions has been stated often. (See United States ex rel. Walker v. LaVallee, (NDNY), 194 F.Supp. 351; 224 F.Supp. 661).

In my first decision in this proceeding I issued the writ of habeas corpus for the production for a hearing of petitioner-prisoner Bruno, who had been convicted at the trial and sentenced in 1947 to 30–60 years. (D.C., 233 F.Supp. 546, September 1964). The second decision sustained the writ after the hearing and set aside conditionally the judgment of conviction. (D.C., 246 F.Supp. 363 (October 14, 1965)). The third is in 39 Fed.Rules Decisions, 570 (March 23, 1966), reaffirming the previous decision and relates to a State motion under F.R.Civ.Proc. 60(b) (6) to be relieved from the October 14th order sustaining the writ.

It should be noted at the outset of this fourth decision that one of the points raised preliminarily to the merits herein was that deprivation of a public trial under the federal Sixth Amendment was not binding upon the States. In the decision reported in 246 F.Supp. 363, at page 367, I listed the significant Supreme Court cases which led me to contrary conclusion. To those may now be added Spevack v. Klein, (1967), 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574; Klopfer v. State of North Carolina, (1967), 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1.

The order sustaining the writ and voiding the conviction was reversed by the Court of Appeals, Second Circuit, "and the case is remanded for rehearing." (United States ex rel. Bruno v. Herold, (1966), 2 Cir., 368 F.2d 187). With due deference, I must admit the writing of reversal and remand per curiam by two of the three-judge panel has puzzling aspects for my present role in the proceeding. The majority did state that under the record as made the act of the State Judge in clearing the courtroom was well within his discretion. Upon the same record I gave full credence and weight to the new affidavits supplied, but my findings and conclusions are to the contrary. Judge Moore, in his separate concurrence, it is evident unquestionably was at the stage to reverse unequivocally without remand for rehearing, being satisfied that the trial judge acted within the broadest discretion that must be accorded acts of this kind. Judge Moore stressed that experienced counsel with knowledge of the previous circumstances that prompted the Court's action felt that an objection was unwarranted, did not object and in effect waived intelligently the public trial right.

I am fully aware and completely cognizant from the writing that the Cir-

cuit Court is of a mind to disagree with my ruling, and leans toward flat reversal. However, reversal and differing conclusions are circumstances and events with which District Judges after some experience are not too unfamiliar. My decision was made in accord with my firm convictions. It may only be an act of appellate grace for which I am appreciative that instead of reversal rehearing was ordered with this conclusion:

> "It may well be that on rehearing with a full opportunity to both parties to examine and cross-examine witnesses and offer other evidence, the trial court may find the facts to be quite different from those herein assumed for the purpose of testing the denial of the Rule 60(b) motion, and in rendering this decision we do not intend to prejudge that factual issue."

Pursuant thereto, when the rehearing was held on February 6, 1967, I not only heard the testimony of Judge Leibowitz, Judge Helfand (the prosecutor in 1947), and defense counsel Brodsky, all of whom had previously submitted affidavits in this proceeding after their recollection had been refreshed, but also the petitioner Bruno again at his request, and his brother, Alphonse Bruno, an important witness, in my opinion. The brother had never testified previously or submitted an affidavit in this habeas corpus proceeding.

The record references herein will be to the hearing of February 6, 1967. Assistant Attorney General Lewittes, who appeared for the Respondent State Director at the hearing, questioned my attitude to hear all witnesses offered by either side, and objected to this expansion. He argued that the remand direction of the Circuit Court did not authorize such ruling and the inquiry should be restricted to the credibility of matters contained in the Judges' and defense counsel's affidavits that previously had been submitted and considered. (R. 49–54). My policy always has been in federal habeas corpus involving State prisoners usually in confinement, as Bruno is, to abandon virtually the legal procedural and evidentiary technicalities applicable in other civil proceedings in order to facilitate presentation by a person hampered to some degree in presentation of his claims. I am content with the ruling on my part that allowed full hearing, and feel as I interpret the directive words of the Appellate Court for hearing quoted above that it should not be otherwise.

Evidentiary hearings and rehearings that produce live witnesses, further exhibits and records not previously offered or considered, as every trial judge and trial lawyer knows, are advantageous to a better grasp of the true trial atmosphere. A cold, printed record is always handicapped in that portrayal. Beside the five live witnesses who testified in the last hearing here in Albany there were offered and received in evidence Respondent's Ex. A—a transcript of the trial that ended in mistrial on May 22, 1947 before Judge Goldstein; a bound volume entitled "Records and Briefs No. 403, Miles F. McDonald, District Attorney", which contains the record on appeal of the two-day trial had before Judge Leibowitz on May 26 and 27, 1947, carrying through to the sentencing of Bruno and his co-defendants in September, 1947. The references to this Record of the District Attorney shall be by ROA symbol. These records are important aids to illuminate the background and conduct pertinent to the dominant issue we have here, namely, the exclusion of the public that occurred immediately after DiBari was sworn as a prosecution witness and before he testified at the trial before Judge Leibowitz. (ROA 61).

DiBari was the sole identification witness of the three defendants on trial charged with Armed Robbery, Grand Larceny and Assault. Judge Helfand, at the hearing before me, candidly stated without such testimony of DiBari he had no case. (R. 23). In fact, I think it is important to read the entire testimony of DiBari in the "Records and Briefs" noted above, from p. 61 through p. 111, in order to evaluate whether or not there was a free flow of his testimony and whether or not it is indicative in itself

of an overwhelming obsession of fear just before or at the time he gave it. This testimony of DiBari—and he gave several physical demonstrations to describe incidents occurring at the Robbery—commenced on May 26, 1947 and ended the following morning of May 27th.

There was also presented at the rehearing a large Clerk's docket book, marked "Part 3, May 13—November, 1947", also never before submitted to me in the proceeding which was referred to by Judge Leibowitz to correct his affidavit of January 7, 1966 in certain respects. (R. 33–36). The correction to be made was that in his affidavit it was averred that the following morning after DiBari completed his testimony "the courtroom was reopened to the public." The Judge explained at the rehearing that this court docket or log book indicates to him that he had numerous criminal matters, sentences, motions, etc., on the morning of May 27th, and the courtroom was crowded with lawyers and defendants, and so forth. Thereafter, it is now his impression from this record, the doors remained open to the public in the usual course after these preliminary matters and there was no need to announce readmission of the public for the Bruno trial. The trial the Judge reconstructs continued as a matter of course, and: "Nobody stopped anybody from coming in the following day." (R. 34–36). This is the morning of May 27th when DiBari was to continue as a witness. It should be noted at this point there is nothing in the docket book referring to the exclusion statement of May 26th after DiBari was sworn, nor is there any entry about a declaration of admission for the public on the following day. The docket does indicate a number of criminal motions and matters of various kinds handled by Judge Leibowitz before the Bruno trial is recorded by handwritten entry to have commenced again.

Respondent's Exhibit A is the minutes of the previous aborted trial before Judge Goldstein. These minutes show there was agreement to mistrial on May 22, 1947, after the jury was sworn and nothing else done. The case was set down for May 26th. After the declaration of mistrial and excusal of the jury, the District Attorney moved to have DiBari, this very important witness for the prosecution committed and held as a material witness with bond fixed at $50,-000.00. There is little question DiBari expressed an attitude he would not testify for the People, and if forced to that he would lie. He was told by the Judge in strong language that if he did not stick to the truth in the case, tell exactly what happened, and what he told before the Grand Jury, he would be a defendant instead "of these three notorious gunmen and robbers". Assistant District Attorney Helfand added the warning: "Except that I might point out to Your Honor that this witness will be told, when the case resumes for trial, whenever that is, if he wants to take the stand and lie, he will be confronted with his testimony before the Grand Jury, and if he admits in open court that he is lying in that event we intend to indict him and prosecute him for perjury, as Your Honor has already indicated to him. Perhaps the time he is in custody he can think this over."

Four days later the trial commenced before Judge Leibowitz, and it seems fair inference to conclude the above background must have been a topic of conversation to some extent in the same courthouse building. The testimony of Judge Helfand about the incident of exclusion seemed to settle down to recollection that he showed the minutes of the Judge Goldstein mistrial and statements to Judge Leibowitz at the second trial at a conference at the Bench with defense counsel present just prior to calling DiBari as a witness. (R. 8–13). It was the Judge's recollection—and I am conscious throughout this review recollection may be dimmed by the long passage of time—that DiBari had said, and Judge Leibowitz was so informed, that he would not testify in the presence in the courtroom of the defendants' families who he claimed were responsible for the previous

threats, and that he was in mortal fear. Judge Leibowitz, in his testimony, did not recall whether he was shown the minutes of the incidents before Judge Goldstein, but said it was either at the commencement of the trial or after one or two witnesses testified that Assistant District Attorney Helfand approached the Bench and apprised him that DiBari was in mortal fear of the "gang in the courtroom", and if they were there he would not testify, and if he was forced to testify he would lie about the identification. (R. 26–27). Attorney Brodsky, an able and experienced criminal lawyer, testifying at the hearing, said he was just reconstructing, but that the divulgence about the Judge Goldstein incidents to Judge Leibowitz may have happened in the Judge's robing room or at the Bench with the jury excused. (R. 48). Attorney Brodsky frankly said he thought an objection on his part would be "unavailing" and would have been overruled, so he made none. (R. 46). The three witnesses were agreed and remembered clearly just as Judge Leibowitz put it: "There was no disorder in the courtroom whatsoever; * * * no shouting, no yelling. There was none of that." (R. 42–43).

Judge Leibowitz seems to place his judgment to exclude the public audience from the courtroom mainly on these factors described in his own language: " * * * DiBari was brought in and stood up and he was sworn in a routine fashion. And I sat on the bench, where you are, Your Honor, and I looked right into that courtroom, and there were thirty or forty people who were there, and they leaned, some of them leaned forward and grinned and grimaced, and this man sat facing them. And he turned white as a sheet and his hands trembled, and he was speechless. And I knew this from my experience as a criminal lawyer of 22 years and being on the bench for about seven years what was happening here. * * *." (R. 30).

A review of the testimony before me of the petitioner's brother, Alphonse Bruno has a ring of truth to it in relation to the question involved as to whether forty or fifty people were not only excluded from the courtroom but also everyone in the other separate jury box as well. He described rather a bizarre incident. He said the famed Brooklyn baseball player, Cookie Lavagetto, was in the other jury box that day (separate from the one in which the jurors sat), and was introduced to the courtroom assemblage at some time before the courtroom was cleared. The brother testified he was with his mother in the courtroom, in the front row, and was one of the last to leave, and the famed baseball player came out of this spare jury box and left with the rest of the audience when the order to clear the courtroom was made by the Judge. (R. 75–78). The petitioner then took the stand at the rehearing before me and embellished the incident further by testifying Lavagetto was not alone but had his pregnant wife with him, and she went out too with her husband from the separate jury box when the exclusion statement was made. (R. 83). It would be difficult to imagine or fabricate such happenings.

The important feature of the testimony of petitioner's brother is his absolute recollection that after he and his mother were excluded they were never allowed back in the courtroom again during the two-day trial. He said they remained in the hallway and to his knowledge and observation there were no spectators ever allowed back in a closed, guarded courtroom when the trial was on. (R. 71). He testified he and his mother acted "nice and calm" when in the courtroom. (R. 74). He did not hear the summations of the lawyers or charge of the Court and he and his mother knew nothing about the court proceedings until Attorney Brodsky came out the afternoon of the second day to tell him and his mother: "The boys were found guilty." (R. 62). Another important point this brother of petitioner established was there were no newspaper write-ups of the trial on May 26th and May 27th. (R. 66). This may evidence the absence of press reporters during the trial if that

is important. The News write-up of May 28th does not relate to anything I find in the trial record and seems to cover comments of the Judge after the trial. My impression of the lay evidence is that busy lawyers and judges who have contact with many trials and defendants may tend to have blurred memory of a particular one after many years, but the lay person, when himself or a member of his family is involved probably only in one, might be more inclined toward graphic recollection.

 I have no quarrel with the understandable high motives of the Prosecutor and Judge to protect their community from notorious criminals, but in my opinion, constitutional rights cannot be disregarded even slightly, though some may think under the circumstances the end justifies the means. Psychological observations and conclusions of a witness' demeanor without more I do not think measure up to the presence or threat of disorder whereby the closing of a courtroom to some or all of the spectators is authorized by law. An act of exclusion may not be foreordained to alleviate fear or apprehension on the part of any witness in a criminal prosecution. The record of the trial shows without doubt there was not a scintilla of other evidence at the trial than that given by this witness in this unusual courtroom setting to involve the defendants.

The robbery occurred on December 12, 1946. The defendants were arrested April 4, 1947. DiBari testified he identified the defendants in two separate police stations before the trials simply by being taken into a room where they were and without the arrangement of a lineup. (ROA 78, 79; see United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, 6/12/67).

Significant remarks, in my opinion, were made by Judge Leibowitz during the sentencing of co-defendant Carlucci. " * * * When the case appeared on the calendar before Judge Goldstein, the identifying witness was so terrorized by the agents of these defendants that he was in mortal fear of his life, and it

*required a lot of assurance from the court and the prosecuting officials before the witness was called to take the stand and testify. * * *."* (ROA No. 403, pgs. 166–67, September 3, 1947; emphasis supplied).

In many criminal trials it has been my experience that it is not uncommon to encounter and observe recalcitrant, fearful, complaining or prosecution witnesses, but it is uncommon, as demonstrated by the few instances in which it is done, to exclude the public from a trial unless such exclusion is authorized by law or physical disorder in the courtroom has occurred or is about to occur. (See Section 4, Judiciary Law, McKinney's Consol.Laws, c. 30, New York; People v. Jelke, 308 N.Y. 56, 123 N.E.2d 769, 48 A.L.R.2d 1425; Matter of United Press Associations v. Valente, 308 N.Y. 71, 123 N.E.2d 777). Trials of the most notorious gangsters have been and are still held in public, open courtrooms. The standard safeguard in the administration of justice for every witness when their safety is a matter of concern is to double security measures or take other similar precautions. There is nothing in this record to show any outbreak of disorder or potential disorder by exclamations of spectators, and no admonition or warning to anyone in the courtroom that any type of conduct detrimental to good order should stop or not commence.

 Of course, the discretion in situations of this kind should be the broadest. However, it has been well phrased that when courts are said to exercise discretion it is a mere legal discretion to be exercised in discerning the course prescribed by law, and when that is discerned it is the duty of the Court to follow it. Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the legislature; or in other words, to the will of the law. (Osborn v. Bank of United States (Ch. J. Marshall, 1824), 9 Wheat. 738, 862, 22 U.S. 738, 862, 6 L.Ed. 204, 234). In my judgment, an order excluding the public from a criminal trial

should be a decision of the last resort. If it is to be used freely when a witness is reluctant to testify, or threatens to lie, then I think we approach a dangerous doctrine. The best resort, then, as it has always been, is to put him on the stand, see what attitude he takes, impeach him, and if he persists in lying, indict him. Examination and cross-examination of a witness in the public view predominates in our trial system in this country.

█ From evidence at the hearings before me I am not persuaded there was waiver by Attorney Brodsky that meets the requirements of Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837, interpreting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461. There was not a considered choice by the petitioner Bruno and it is clear to me he did not actually know at all what was going on or being agreed to by his lawyer, nor was the matter ever discussed with him. There was no express consent to exclusion given by defense counsel. (See United States v. Sorrentino, 3 Cir., 175 F.2d 721, 723). In fact, accepting the version of Judge Leibowitz that his judgment to exclude was mainly based upon on-the-spot observation of the witness and the courtroom audience, it would seem that Attorney Brodsky had little advance notice, if any, of the spontaneous announcement of exclusion that gave no reasons in it for its declaration. Petitioner denied there was a conference at all at the Bench before the exclusion announcement, and testified his lawyer never said anything to him about possible exclusion of the public. (See State Criminal Procedure & Federal Habeas Corpus, Section III; The Problem of Waiver, Vol. 80, Harvard Law Review, 1966, pg. 433 et seq.).

Of course, it is an unpleasant task, but as I did before when I made findings and conclusions in accord with my conscientious convictions I hereby reaffirm the order of October 14, 1965, 246 F.Supp. 363, conditionally sustaining the writ of habeas corpus. I am not sure whether a certificate of probable cause

is again necessary, but if so it hereby issues to the Respondent without formal application. It may be a new notice of appeal should be filed, inasmuch as the entire file was returned to this District Court from the Court of Appeals, Second Circuit. The Records & Briefs No. 403 and the Court docket book referred to herein shall be delivered to Assistant Attorney General Castellani here in Albany to be kept available for the appellate review in New York City.

I reaffirm my previous decisions that ruled upon the merits of the petition.

It is So Ordered.