**UNITED STATES of America ex rel. Anthony BRUNO, Petitioner-Appellee,**

v.

**Ross E. HEROLD, M.D., Director of Dannemora State Hospital, Dannemora, New York, Respondent-Appellant.**

No. 176, Docket 31673.

United States Court of Appeals Second Circuit.

Argued Dec. 4, 1967.

Decided Feb. 14, 1969.

**126**

Waterman, Circuit Judge, dissented.

Joel Lewittes, New York City (Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

F. Redmond Griffin, Troy, N. Y. (Smith, Pattison, Sampson & Jones, Troy, N. Y.), for petitioner-appellee.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

MOORE, Circuit Judge:

In September, 1947, petitioner was tried before a jury in the Kings County Court, New York; he was found guilty of robbery, grand larceny, and assault. The judgment of conviction was affirmed. People v. Bruno, 273 A.D. 977, 79 N.Y.S.2d 328 (1948). In 1963, petitioner applied to the New York Courts for a writ of *coram nobis*. He alleged, for the first time, that he had been deprived of his constitutional right to a public trial in 1947. Judge Leibowitz denied his motion without a hearing and the Appellate Division affirmed the denial. People v. Bruno, 20 A.D.2d 852, 249 N.Y.S.2d 406 (1964). The New York Court of Appeals denied leave to appeal.

In 1964, petitioner sought a writ of habeas corpus in the federal courts. Chief Judge Foley of the Northern District of New York issued the writ for the production of petitioner for a hearing. United States ex rel. Bruno v. Herold, 233 F.Supp. 546 (N.D.N.Y.1964). After the hearing, he sustained the writ and set aside the judgment as void. United States ex rel. Bruno v. Herold, 246 F.Supp. 363 (N.D.N.Y.1965). The respondent, Herold, appealed. In March, 1966, upon motion based on additional affidavits, Chief Judge Foley reaffirmed the previous decision. United States ex rel. Bruno v. Herold, 39 F.R.D. 570 (N.D. N.Y.1966). In September, 1966, we remanded the case for a rehearing. United States ex rel. Bruno v. Herold, 368 F.2d 187 (2d Cir. 1966). After the rehearing, Judge Foley again reaffirmed his previous decision, although "completely cognizant from the writing that the Circuit Court is of a mind to disagree with my ruling, and leans toward flat reversal." United States ex rel. Bruno v. Herold, 271 F.Supp. 491, 492–493 (N.D.N.Y.1967). This is an appeal from that decision.

I

The facts basic to a determination of this proceeding center around an incident in the courtroom during petitioner's 1947 state court trial in which the trial judge, to meet a special situation which unexpectedly arose, said:

"I think I will clear the courtroom. Have everybody step out except the people in the jury box."

Petitioner, together with two others, was on trial for the crimes of robbery, grand larceny, and assault. A witness, DiBari, was important for the People as the sole identification witness. A few days earlier a jury had been selected and sworn (before Judge Goldstein) but a mistrial had been declared, DiBari having taken the position that he would not testify for the People. Four days later the trial commenced (before Judge

Leibowitz). At some time before DiBari testified, the trial judge was made aware of the fact that DiBari was in "mortal fear of the 'gang in the courtroom.'" When DiBari was sworn as a witness, the judge observed "thirty or forty people who were there, and they leaned, some of them leaned forward and grinned and grimaced, and this man sat facing them. And he turned white as a sheet and his hands trembled, and he was speechless. And I knew this from my experience as a criminal lawyer of 22 years and being on the bench for about seven years what was happening here." (Testimony of Judge Leibowitz, 271 F. Supp. at 495.) It was against this background that the trial judge gave his directions to clear the courtroom, except the people in the jury box. Obviously, this meant the people in the other jury box [1] because the trial judge could not have excluded the jury in a jury trial. The Judge had to meet an unusual and unexpected courtroom situation in which the interest of the prosecution, the defendant and the witness equally had to be protected. Discretion, not lightly to be disturbed after twenty years by others not then present or faced with the emergency, had to be exercised by the judge responsible for the conduct of the trial. Thus, petitioner was not in fact denied a public trial. The proof supports a conclusion that there was only a partial exclusion on the first day of trial and none on the second.

A Sixth Amendment situation is not reached. There was no *in camera* or secret trial. It was held in a public courtroom with attorneys, court reporters, court attendants and at least some outsiders present. Surely there is no constitutional right to the presence of all public spectators who might desire to be present—or to the presence of such element as might be detrimental to an orderly trial uninfluenced by deterrents to truthful testimony.

---

1. There was proof, by affidavit, "that a number of civilians remained in the second jury box, usually reserved for attorneys and reporters." 39 F.R.D. at 572.

Excerpts of testimony at the hearing on February 6, 1967.

Julius Helfand, a Judge of the Supreme Court, Kings County, New York, who in 1947 as an Assistant District Attorney represented the People in the *Bruno* trial:

"There was a jury box on the left, and another on the right. That was the one used for the trial itself. And the alternate lefthand jury box was one used for members of the press, counsel, their clerks, and often visitors —some of whom may have been known to the judge, defense counsel, and prosecution. It seated more than the ordinary 12, and the box was partially filled with people. They remained in the courtroom when the order of exclusion was made."

* * * * *

"I had called other witnesses, probably the owners of the Cirillo Brothers Coal Company, the place where the holdup had taken place. One or more of the members of the firm testified. It was then that DiBari was to be called, and during the testimony of the other witnesses, no one had been excluded."

* * * * *

"I recall this was jury box where there were always people present. Yes, there was in this case. Just no question about that."

* * * * *

"I put it in this way, that I had discussed it [the exclusionary order] with the trial court and the defense counsel, and then it was done. We all were in agreement that this is what should be done."

Samuel Leibowitz, a Judge of the Supreme Court, Kings County, New York, who presided at the *Bruno* trial:

"They [reporters] were there every day. They have their room in the Courthouse and they were sitting there in the jury box and so were other people there."

* * * * *

" * * * and there just remained a few minutes of cross-examination [of DiBari] by Mr. Brodsky on the following day, so there was nothing said about people coming in, and people were there. Nobody stopped anybody from coming in on the following day."

Abraham H. Brodsky, Esq., Bruno's trial counsel:

"I have a recollection that there were some members of the press present in the other jury box."

Most pertinent is the situation and decision in United States ex rel. Orlando v. Fay, 350 F.2d 967, 971 (2d Cir., 1965), cert. denied, Orlando v. Follette, 384 U.S. 1008, 86 S.Ct. 1961, 16 L.Ed.2d 1021 (1965), where the trial judge excluded all the spectators because he believed that certain spectators were intimidating a witness. In *Orlando,* Chief Judge Lumbard, writing for the court, said (350 F.2d p. 970):

"In our view, the record amply supports the conclusion that Orlando's right to a public trial was not denied. The trial judge had good reason to believe that many persons in the courtroom were acting so as to interfere with the orderly conduct of the trial. There was good reason for the judge to believe that the defendant's family and friends, including members of his union, at the behest and for the benefit of the defense, were attempting to intimidate and harass witnesses and otherwise to disrupt the proceedings. Under such circumstances the trial judge must exercise his power to exclude those who so act and those who appear to be acting in concert with them lest it be impossible for the trial to proceed and for the jury to pass upon the charges."

On a previous appeal in this case, we said:

"On the basis of that assumption [statements in the affidavits and the reasonable inferences to be drawn therefrom to be true] it is apparent that the act of the judge of the state court in clearing the courtroom was well within his discretion. It was reasonable for him to conclude that he was confronted with a situation where the principal witness for the state had been intimidated and was likely to be further intimidated by the mere presence of certain persons, whom the judge could not specifically identify, so that the orderly proceeding of the state court trial would be completely stultified. Under the circumstances a denial by the court below of the Rule 60(b) motion went beyond the range of permissible discretion. The constitutional right to a public trial is subject to the power of the judge to preserve the fairness and orderliness of the proceedings of the court. United States ex rel. Orlando v. Fay, 350 F.2d 967 (2 Cir. 1965)."

And somewhat analogous is the recent situation in a New York federal court where to maintain courtroom decorum, the trial judge ordered certain defendants in a multi-defendant criminal case to be shackled and even gagged as they sat before the jury for days. United States v. Bentvena, 319 F.2d 916, 930 (2d Cir.), cert denied, sub. nom. Mirra v. United States, 375 U.S. 740, 84 S.Ct. 360, 11 L.Ed.2d 272 (1963).

Of primary importance to decision is the fact that petitioner in his trial was represented by Abraham Brodsky, "an able and experienced criminal lawyer." 271 F.Supp. at 495. He did not object to the exclusion order. He, apparently, did not think that his client's rights were prejudiced by the order. He, in fact, stated upon the hearing that under the circumstances he "offered no objection when the courtroom was cleared of spectators in the belief that an objection under the circumstances, which were known to deponent [Brodsky], would be neither warranted nor sustainable." *Affidavit of A. Brodsky, dated Dec. 20, 1965.* Brodsky also stated in the same affidavit that "When DiBari was called to the stand to testify, Judge Leibowitz cleared the courtroom with the exception of a number of civilians who occupied a second jury box usually reserved for attorneys and reporters." Thus, petitioner, in fact, had a public trial.

## II

This Court would be closing its eyes to reality if it did not give proper recognition to the quality and experience of petitioner's trial counsel. His knowledge of trial procedures and stratagems may be assumed. This assumption bears both upon the actual situation in the courtroom and upon intelligent waiver were the situation otherwise.

Counsel obviously knew of the Sixth Amendment and his client's rights thereunder. Had he been satisfied that his client was being denied a public trial, he would have been the first to object. Lack of objection then gives support to the other testimony that the courtroom was not completely cleared and that only the element which might have been prejudicial to a fair trial was requested to withdraw. Counsel's recollection that an objection would not have been "warranted" in the light of the situation then presented to him is entitled to considerable weight in determining that petitioner was not deprived of Sixth Amendment rights as a matter of fact.

### III

Even were the facts otherwise, did petitioner have a right to a trial at which were present persons who might seriously have affected the testimony of the witness on the stand? It would be difficult to find any space between the lines of the Sixth Amendment into which to write any such declaration. But again, assuming such a far-fetched right, could it be waived as a matter of lack of importance or trial strategy?

 From the commencement until the termination of every criminal trial, countless problems arise as to admissibility of evidence, comments of court and counsel and courtroom incidents. Absent quite extraordinary circumstances, the trial counsel and the trial judge then on the scene should be presumed to be the best qualified to appraise the situation requiring trial rulings. Federal judges sitting in habeas corpus should be most reluctant to retry the case from the vantage point of their reflective wisdom.

In finding no waiver of petitioner's alleged rights in this case, Judge Foley relied on Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). In Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), the Supreme Court said:

" * * * counsel's deliberate choice of the strategy would amount to a waiver binding on petitioner and would preclude him from a decision on the merits of his federal claim either in the state courts or here. Although trial strategy adopted by counsel without prior consultation with an accused will not, where the circumstances are exceptional, preclude the accused from asserting constitutional claims, see Whitus v. Balkcom, 333 F.2d 496 (C.A. 5th Cir. 1964), we think that the deliberate bypassing by counsel of the contemporaneous-objection rule as a part of trial strategy would have that effect in this case." *Supra*, at 451, 85 S.Ct. at 569.

However, in reading *Fay* and *Henry*, recognition must be given to the fact that they cover situations along quite distinct lines. Along the *Fay* line are decisions whether to plead guilty, to appeal, and the like. Along the *Henry* line are the decisions, such as the present one, dealing with courtroom tactics and matters which only trial counsel would be equipped to pass on in the exercise of judgment under the circumstances presented by the then exigencies of the trial. Of necessity trial strategy must be entrusted to counsel familiar with the courtroom scene and whose decisions must be made in quick reaction as situations, usually unexpected, may arise. The *Fay* type of decision is apt to be made in the less pressurized atmosphere during conferences between defendant and counsel and related to more fundamental questions.

 Here at most there was a single incident which at best could be likened unto discretionary courtroom "housekeeping." And despite the technical arguments, none has shown that petitioner was prejudiced in any way and did not receive a fair trial.

Reversed.

WATERMAN, Circuit Judge (dissenting):

I respectfully dissent from my brothers.

In his fourth well-considered opinion in these proceedings, Judge Foley, after a second evidentiary hearing which we

ordered, for the second time has sustained Bruno's writ of habeas corpus, and a second time has ordered that Bruno be conditionally released from New York State custody. Judge Foley found that petitioner's Sixth Amendment right to a public trial was violated when the state trial judge cleared the courtroom during petitioner's New York State trial for armed robbery, grand larceny, and assault. When this case was before this Court previously, I joined in our *per curiam* decision, United States ex rel. Bruno v. Herold, 368 F.2d 187 (1966). When we remanded it with instructions that this second evidentiary hearing be conducted. Now that Judge Foley has held that hearing and has again determined that the petition has merit, I would affirm his decision.*

My brothers ignore completely the fact that Judge Foley decided the issue of ultimate fact before him by crediting the testimony of the petitioner and his brother that after two witnesses had been sworn the courtroom was fully cleared of all spectators, including the mother and brother of petitioner, rather than the testimony of the trial judge and the prosecutor, both of whom are now judges of the State of New York's trial court of general *nisi prius* jurisdiction, and the uncertain testimony of defense counsel who frankly stated that he was attempting to reconstruct events of which he had no independent recollection. It was the thought of these three Warden's witnesses that the courtroom was cleared that day except for such lay persons as may have been sitting in a second jury box not occupied by the trial jury.

Irrespective of whether this resolution of the credibility of the five principals appears to us to have been reasonable, we, inasmuch as there are no contemporaneous documents to color or challenge the oral testimony, must accept Judge Foley's resolution unless we are so convinced that a mistake has been made that we can hold his findings to have been "clearly erroneous" by our independent examination of the evidence. United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Judge Foley had made his findings by evaluating the oral testimony of the five individuals for there was no other evidence to assist any evaluation he might make except state trial records, appeal records, and a court clerk's desk docket book containing no entry of the exclusion order, see 271 F.Supp. 491, 493–494 (N.D.N.Y., 1967) and none of these documents indicates what happened after the judge ordered the exclusion.

Under the circumstances, I am not convinced that we should overturn his findings so made, or that Judge Foley has made a mistake. In any event, the issue for decision was whether Bruno was denied a "public trial" and in connection with that issue, this conflict in the testimony would not appear to be of vitally decisive importance. See Estes v. Texas, 381 U.S. 532, 588–589, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), Justice Harlan concurring, quoted *infra*, 408 F. 2d p. 133. Inasmuch as I was on the panel that sent this case back to Judge Foley for his determination of the facts, and as he has done so in accord with our instructions, I am puzzled that the majority should upset his findings. Even a casual reading of his opinion demonstrates that the facts he found are well supported by the testimony he heard.

In the last paragraph of part I of their opinion, as well as in parts II and III, my brothers, in addition to reversing Judge Foley by ignoring his factual determinations, would seem also to offer as grounds for their reversal that the

---

\* As of December 31, 1968, 467 habeas corpus petitions filed in the United States District Court for the Northern District of New York by persons convicted in the New York state courts had been entertained by Judge Foley to the extent that he had written memorandum dispositions thereof. Of these 467 he had denied 380 without a hearing and without issuing the requested writ; he had denied 73 after issuing the writ and holding an evidentiary hearing; and in only 14 of the cases, after hearing, did he sustain the writ.

failure of defense counsel to object contemporaneously to the trial judge's order clearing the courtroom constituted a waiver of his client's right to a public trial. They find support for this position in Henry v. Mississippi, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) where the Supreme Court held that an accused's counsel could waive a constitutional right of his client by by-passing an opportunity to object to a prejudicial ruling during a trial if it could be demonstrated that counsel's failure to object was motivated by trial strategy. Though mentioning Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1961), my brothers appear to hold that the standard established in *Noia* that such a waiver may occur only when the accused *himself*, knowing of the existence of his right, has deliberately by-passed the right, has no application here.

I agree with my brothers that recognition must be accorded the fact that *Henry* and *Noia* arose out of different situations, but I think it evident that a decision that no objection should be interposed to the order clearing the courtroom was a decision defense counsel should not have made without first consulting with his client.

Therefore, I would hold that only the *Noia* standard of deliberate bypass by the accused himself can suffice as a court-inferred waiver of petitioner's right to a public trial. Consequently, I dissent from my brothers, not only because I believe our Court should refrain from substituting our beliefs as to witness credibility for the credibility determinations of the experienced and conscientious trial judge below who saw and heard the live witnesses and, there being no contradictory probative documents, based his determinations upon his evaluation of their oral testimony, but also because I believe the majority has erroneously misapplied *Henry* in relation to *Noia*.

A preliminary question that must first be considered is whether the Sixth Amendment right to a public trial is applicable to the states under the Fourteenth Amendment. The question arises infrequently because practically all of the states, other than New York, guarantee the right in their state constitutions.[1] A reading of Gaines v. Washington, 277 U.S. 81, 48 S.Ct. 468, 72 L.Ed. 793 (1928), as interpreted in In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), indicates that, like several other key provisions of the Sixth Amendment which have been held applicable to the states, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923

1. At least forty-three states have constitutional provisions providing for a public trial. E.g., Ala.Const. art. I, § 6; Alaska Const. art. I, § 11; Ariz.Const. art. II, § 24; Ark.Const. art. II, § 10; Cal. Const. art. I, § 13; Colo.Const. art. II, § 16; Conn.Const. art. I, § 9; Del.Const. art. I, § 7; Fla.Const. Declaration of Rights § 11; Ga.Const. art. I, § 1, ¶ 5; Hawaii Const. art. I, § 11; Idaho Const. art. I, § 13; Ill.Const. art. 2, § 9; Ind. Const. art. I, § 13; Iowa Const. art. I, § 10; Kan.Const. Bill of Rights § 10; Ky.Const. Bill of Rights § 11; La.Const. art. I, § 9; Me.Const. art. I, § 6; Mich. Const. art. I, § 20; Minn.Const. art. I, § 6; Miss.Const. art. III, § 26; Mo. Const. art. I, § 18(a); Mont.Const. art. 3, § 16; Neb.Const. art. I, § 11; N.J. Const. art. I, § 10; N.M.Const. art. II, § 14; N.C.Const. art. I, § 13; N.D. Const. art. I, § 13; Ohio Const. art. I,

§ 10; Okla.Const. art. 2, § 20; Or. Const. art. I, § 11; Pa.Const. art. I, § 9; R.I.Const. art. I, § 10; S.C.Const. art. I, § 18; S.D.Const. art. 6, § 7; Tenn.Const. art. I, § 9; Tex.Const. art. I, § 10; Utah Const. art. I, § 12; Vt. Const. ch. I, art. 10; Wash.Const. art. I, § 22; W.Va.Const. art. III, § 14; Wis.Const. art. I, § 7.

In New York a public trial is guaranteed by statute. See Section 8 of New York Code of Criminal Procedure: Section 12, Civil Rights Law, McKinney's Consol.Laws, c. 6.

Exclusion of the public is permissible by statute when certain classes of crimes are at issue. See Section 4 of the Judiciary Law, McKinney's Consol.Laws, c. 30. The crimes that Bruno was charged with having committed are not within those classes.

(1965); and Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (right to confront witnesses); also Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1966) (right to a speedy trial);[2] this provision is binding on the states on "due process" grounds. In fact, the court in *Oliver* stated that in *Gaines* it

> " * * * assumed that a criminal trial conducted in secret would violate the procedural requirements of the Fourteenth Amendment's due process clause, although its actual holding there was that no violation had in fact occurred, since the trial court's order barring the general public had not been enforced." 333 U.S. at 272, 68 S.Ct. at 507.

Broadly read, *Oliver* stands for the proposition that

> "In view of this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public, the Fourteenth Amendment's guarantee that no one shall be deprived of his liberty without due process of law means at least that an accused cannot be thus sentenced to prison." 333 U.S. at 273, 68 S.Ct. at 507.

Reference may be had, also, to Chief Justice Warren's and Justice Harlan's concurring opinions in Estes v. State of Texas, 381 U.S. 532 (1965), at 552 and 587 respectively, 85 S.Ct. 1628, 14 L.Ed.2d 543. There, joined by Justices Douglas and Goldberg, the Chief Justice listed among the fundamental provisions of a fair trial contained in the Sixth Amendment the "right to have the proceedings open to the public" (citing *Oliver*), 381 U.S. at 560, 85 S.Ct. at 1641, a right which Justice Harlan says "reflects a concept fundamental to the administration of justice in this Country" (Citing *Oliver*), 381 U.S. at 588, 85 S.Ct. at 1662. Therefore, I can discern no logical or legal justification for holding that the right to a public trial should not be applicable to the states, for this right, as the other Sixth Amendment rights, is but one of the bundle of rights required to be preserved if we wish to live in a nation where ordered liberty is the rule.

Judge Foley, on May 7, 1964, denied petitioner's first habeas application in a written unreported decision, but after the New York Court of Appeals denied Bruno leave to appeal to that court from adverse determinations entered upon a state court *coram nobis* proceeding, Judge Foley, in September, 1964, issued a habeas writ to hold an evidentiary hearing on October 19. He accompanied this order with a learned written opinion, reported at 233 F.Supp. 546 (1964), in which, among other forthright comments, he said:

> "It is a heavy responsibility after seventeen years have passed to compel the production of this state inmate, but under the law of the highest authority as I read it there must be further processing and inquiry into the claim presented. In my judgment, a hearing must be held to determine whether there was an intelligent and understanding waiver by the petitioner of a known constitutional right * * *." 233 F.Supp. at 550.

---

2. See also, for example, some of the extensions to the States of other provisions of the Federal Bill of Rights, as in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) (Fifth Amendment privilege against self-incrimination applied to the states); in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L. Ed. 1782 (1949), and in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Fourth Amendment prohibition against unreasonable searches and seizures applied to the states); in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (Eighth Amendment prohibition against cruel and unusual punishments applied to the states); and in Gitlow v. New York, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L. Ed. 1138 (1923) (First Amendment freedoms of speech and press held to be protected by the due process clause of the Fourteenth Amendment).

Petitioner's trial was held in May, 1947 and it is quite reasonable to assume that twenty-two years will have passed before the question of whether he intelligently and with understanding waived a known constitutional right during that trial shall have been decided.

At this hearing, see United States ex rel. Bruno v. Herold, 246 F.Supp. 363, 365–366 (1965), the petitioner was the only witness, but he was subjected to a persistent cross-examination by the People's (Warden's) representative. The Warden submitted affidavits of Judge Leibowitz, Judge Helfand, and attorney Brodsky, concerning which Judge Foley stated, at 366:

"I accept these affidavits as good faith recollections, but feel their vagueness, lack of force and indecisiveness are apparent. It would be difficult to rely upon them as a fact-finding source directly or by proper inference, particularly in the light of the persuasive testimony of the petitioner in this respect and the odd fact there is no mention or indication of an untoward incident in any part of the trial record that routinely is made in some form prior to drastic clearance of the public from a courtroom during trial. A finding of justification in the legal sense for the closing of the trial to the public seems unsupportable on these inconclusive affidavits."

It was conceded by the People that the trial judge cleared the courtroom, 246 F. Supp. at 365; and all agree that the only reference to the incident in the trial record was the statement my brothers have interpreted (quite unsatisfactorily) in their majority opinion: "I think I will clear the courtroom. Have everybody step out except the people in the jury box."

Bruno testified that the court attendants put everyone out, including Bruno's mother and brother, and that, except for the attendants, the courtroom was closed to the public for the duration of the two-day trial.

After this hearing, Judge Foley on October 14, 1965 sustained the writ,

noting, at 367, that the "exclusion occurred at a time when the result was an important identification witness was allowed to testify without the usual public scrutiny" and "It is clear there was no objection to the exclusion of the public."

He held that Bruno's right to a public trial had been arbitrarily violated and, in defining that right, he quoted (at 367) from Justice Harlan's concurring opinion in Estes v. Texas, 381 U.S. 532, 588–589, 85 S.Ct. 1628, 1662:

"Thus the right of 'public trial' is not one belonging to the public, but one belonging to the accused, and inhering in the institutional process by which justice is administered. * * * A public trial implies only that the court must be open to those who wish to come, sit in the available seats, conduct themselves with decorum, and observe the trial process."

An appeal was undertaken on behalf of the Warden and while the appeal was pending the People, in January, 1966, submitted a motion to Judge Foley pursuant to F.R.Civ.Proc. 60(b) (6) to relieve the Warden from the October 14, 1965 order. Accompanying the motion were new affidavits by Judges Leibowitz and Helfand and attorney Brodsky. Judge Leibowitz recalled that the prosecutor had told him that the People's essential prosecuting witness, DiBari, had told the prosecutor that he would not testify against Bruno and Bruno's two co-defendants because he feared for his life if he did. The affidavits of Judge Helfand and attorney Brodsky support Judge Liebowitz's recollection as to what Helfand told Leibowitz. All three of these late affidavits contained a statement that each of the affiants now recalled that civilians remained in the courtroom in one of two jury boxes with which the courtroom was equipped.

Of course, Judge Foley, 39 F.R.D. 570 (1966) quite properly denied the motion. He failed to see how these affidavits of recollections so submitted after the hearing, if fully believed, could demonstrate that Bruno had a "public trial"; surely the fear of the witness as

to what might happen to him after he left the courtroom was no justification for permitting him the special privilege he was given,[3] and "the leering eyes and menacing grimaces of some of the spectators" which Judge Liebowitz for the first time averred he saw, at 571, certainly did not indicate that there was any courtroom commotion, noise, or disturbance interrupting the orderly progress of the trial. Nevertheless, Judge Foley entertained the motion on the merits so that the affidavits and his opinion and order denying the motion could become part of the record before the Court of Appeals.

These three late-executed affidavits were before our Court of Appeals when the appeal from the judgment of October 14 was adjudicated. Appellee had objected to having them considered below by Judge Foley or by us, for appellee at no time had consented to their use and, as they were *ex parte*, appellee had had no opportunity to cross-examine the affiants.

We of the appellate court, 368 F. 2d 187 (1966), desired that the People's full case be regularly and adequately presented. We indicated that, if we were to consider the affidavits as part of the record on appeal, we should accept them for that limited purpose as factually truthful. So premised, we reversed the denial of the 60(b)(6) motion and remanded the case to the district court for a rehearing so that the newly-refreshed recollections of Judge Leibowitz, Judge Helfand and attorney Brodsky could be there tested, stating that:

"On rehearing with a full opportunity to both parties to examine and cross-

examine witnesses and offer other evidence, the trial court may find the facts to be quite different from those herein assumed for the purpose of testing the denial of the Rule 60(b) motion, and in rendering this decision we do not intend to pre-judge that factual issue." 368 F.2d at 188.

After the remand Judge Foley held the rehearing we ordered. Judge Leibowitz, Judge Helfand, and counsel Brodsky testified in person. Petitioner testified in person for the second time. Petitioner's brother, Alphonse Bruno, who had never before testified or submitted an affidavit in the case, testified in person. Judge Foley carefully weighed the testimony of these five witnesses, as appears from his reported opinion, 271 F.Supp. 491 (1967). He credited the testimony of Alphonse Bruno, which he summarized, at 495, as follows:

"A review of the testimony before me of the petitioner's brother, Alphonse Bruno has a ring of truth to it in relation to the question involved as to whether forty or fifty people were not only excluded from the courtroom but also everyone in the other separate jury box as well. He described rather a bizarre incident. He said the famed Brooklyn baseball player, Cookie Lavagetto, was in the other jury box that day (separate from the one in which the jurors sat), and was introduced to the courtroom assemblage at some time before the courtroom was cleared. The brother testified he was with his mother in the courtroom, in the front row, and was one of the last to leave, and the famed baseball player came out of this spare jury box and

---

3. An analysis of this affair, an admittedly after-the-fact analysis, causes one to be completely puzzled as to why the judge permitted himself to be so imposed upon by DiBari. If DiBari were truly in fear, and the accuseds were convicted upon his testimony, protective measures after the verdict came down would be required, for whether he testified in Star Chamber or in open court it would be known that his testimony was necessary to convict. A private telling of his story would not protect him from re-

venge after the trial was finished. Clearing the courtroom accorded him no protection whatever—and the two pictures, first, that of a witness telling the judge and prosecutor at the beginning of a trial how, when, and under what circumstances he will tell the truth or will lie, and then, second, the picture of a judge acquiescing in the witness's demands, leaves one somewhat aghast. Contempt proceedings and perjury prosecutions are available to remedy such situations.

left with the rest of the audience when the order to clear the courtroom was made by the Judge." [4]

"* * *

"The important feature of the testimony of petitioner's brother is his absolute recollection that after he and his mother were excluded they were never allowed back in the courtroom again during the two-day trial. He said they remained in the hallway and to his knowledge and observation there were no spectators ever allowed back in a closed, guarded courtroom when the trial was on. (R. 71). He testified he and his mother acted 'nice and calm' when in the courtroom. (R. 74). He did not hear the summations of the lawyers or charge of the Court and he and his mother knew nothing about the court proceedings until Attorney Brodsky came out the afternoon of the second day to tell him and his mother: 'The boys were found guilty.'"

And so Judge Foley reaffirmed his previous decision and order that the writ be sustained. The Warden has again appealed and my brothers would this time reverse and direct that the writ be dismissed.

They do so by discrediting the oral testimony the trial judge credited and by holding that "the proof supports a conclusion that there was only a partial exclusion on the first day of trial and none on the second." Had Judge Foley found these facts I would have gladly accepted them as determinative, but he found a contrary conclusion, to wit, that there was a total exclusion of spectators on both days, and, very obviously indeed, the proof supports that conclusion.

Accordingly, I would uphold the factual determinations Judge Foley made.

In reaching their result my brothers chose to believe the witnesses whose recollections the trial court thought were too vague, inconclusive and uncertain to warrant preference over the clear-cut direct testimony of petitioner and his brother. They completely disregard the trial judge's factual findings, despite Rule 52(a), and forget that the judge below saw and heard the witnesses and conscientiously weighed the credibility of the recollections of all five witnesses who appeared before him. To be sure, the three Warden's witnesses are members of our own profession and are well-known citizens, but like Judge Foley

"My impression of the lay evidence is that busy lawyers and judges who have contact with many trials and defendants may tend to have blurred memory of a particular one after many years, but the lay person, when himself or a member of his family is involved probably only in one, might be more inclined toward graphic recollection." 271 F.Supp. at 496,

and I am as impressed as Judge Foley was with the testimony of the defendant's brother, who recounted an unusual incident involving a famous baseball player, and as Judge Foley said of this testimony: "It would be difficult to imagine or fabricate such happenings." 271 F.Supp. at 495.

I deplore the usurpation by my brothers of the trial judge's function of assessing witness credibility when there are no exhibits or other items of objective evidence to color or contradict the oral testimony of witnesses who have testified in person in the judge's presence and when, as here, the trial judge has "lived with" a case for a number of years.

In addition, Judge Foley points out that there were no May 26 or May 27 newspaper stories about the trial, while there was a May 28 story which appeared after the trial had been concluded and which contained nothing relative to courtroom occurrences on those two days. For

4. This testimony was corroborated by the petitioner, who testified that "Lavagetto was not alone but had his pregnant wife with him, and she went out too with her husband from the separate jury box when the exclusion statement was made." 271 F.Supp. 495.

what this evidence may be worth, it gives credence to petitioner's claim that even the press was excluded from the courtroom.

I, of course, am in full agreement with the majority that broad discretion must be given to trial judges as to how best to conduct a criminal trial, a trial which could terminate, as this one did, in depriving an accused of his freedom for from 30 to 60 years. Nevertheless, the United States Constitution places definite limits on that discretion. Among the most basic of these limitations is the Sixth Amendment command that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * *." In the present case, I, having accepted Judge Foley's findings— (the findings of the trial judge whose errors of law it is our duty to review)— hold with him that the state trial judge overstepped the bounds of sound discretion in depriving this defendant of a public trial. Therefore, though I, a Federal Judge, have a normal reluctance to second guess state trial judges, here, when the discretion exercised by the state trial judge resulted in the clear deprivation of the defendant's constitutional right, I have no hesitancy in overcoming my reluctance to interfere with state court proceedings in order to do justice to this petitioner, who has already spent two decades in confinement; and, as well, to offer guidelines for the future. Again, I adopt the language of Judge Foley:

> "In my judgment, an order excluding the public from a criminal trial should be a decision of the last resort. If it is to be used freely when a witness is reluctant to testify, or threatens to lie, then I think we approach a dangerous doctrine. The best resort, then, as it has always been, is to put him on the stand, see what attitude he takes, impeach him, and if he persists in lying, indict him. Examination and cross-examination of a witness in the public view predominates in our trial system in this country." 271 F.Supp. at 496–497.

In the present case I am convinced that Judge Foley did not err in finding that the courtroom was cleared, and, agreeing that such drastic action was entirely unnecessary and assuredly prejudicial, I would affirm the conclusion that the defendant was denied his constitutional right to a public trial.

My brothers attempt to class this case with United States ex rel. Orlando v. Fay, 350 F.2d 967 (2 Cir. 1965) where Orlando, whose counsel apparently could not control him, interrupted the orderly progress of his trial by shouting at the prosecution's witnesses, and by exclaiming, "That's a lie," "You liar," when they testified. There was also an outcry by a spectator, defendant's mother. Unquestionably, such conduct requires drastic sanctions; otherwise the trial would become a shambles. Here, however, all five witnesses were agreed and, as stated by Judge Leibowitz, remembered clearly: "There was no disorder in the courtroom whatsoever; * * * no shouting, no yelling. There was none of that." 271 F.Supp. at 495.

And though my brothers also consider the courtroom shackling and gagging of a particularly dangerous and loudly obstreperous defendant in United States v. Bentvena, 319 F.2d 916, 930 (2 Cir., 1963) as "somewhat analogous" to the present case, the analogy escapes me entirely.

Alphonse Bruno's testimony is uncontradicted that he and Anthony's mother were excluded from the courtroom where they had been "nice and calm" and that they knew nothing about the courtroom proceedings after their exclusion until Anthony's counsel, attorney Brodsky, told them in the afternoon of the second day that Anthony had been found guilty.

Having in mind this exclusion of the accused's mother and brother who had been decorously sitting in the courtroom's front row of spectators, I am of the opinion that it is immaterial to the constitutional issue here, see quote from Justice Harlan's opinion in Estes v. Texas, *supra* at 587, 85 S.Ct. 1628, whether some other lay individuals remained in a

second jury box. However, Judge Foley was convinced that the order of Judge Leibowitz required the exclusion of everyone except court attendants and jurors. It must be borne in mind that this was a criminal jury trial. Therefore it is possible to believe that "the people in the jury box" who were not ordered excluded were the jurors in their jury box rather than lay people in a second jury box. But, as I have just said, I consider this quite immaterial. The exclusion of brother and mother who were not sitting in either jury box satisfies me that there was a prejudicial violation of the accused's constitutional right to a public trial.[5] Judge Foley's findings that thereafter, for the remainder of the trial, friends, companions, and other spectators sitting in the seats reserved for the public's use were also excluded only aggravates the violation; and, indeed, even interpreting the testimony most favorably to the Warden, all the public, so seated, estimated by Judge Leibowitz to be some thirty or forty persons, 271 F.Supp. at 495, were excluded for a substantial portion of the first day of the two day trial.

Despite Judge Foley's findings as to the changing positions of the three Warden's witnesses as these proceedings progressed, see 246 F.Supp. 363, 365–366 (1965), 39 F.R.D. 570, 571–572 (1966), 271 F.Supp. 491, 494–495 (1967), and the later attempts to invalidate the concession, 246 F.Supp. at 365, by the People's (Warden's) counsel that "the trial judge did clear the courtroom," the testimony of all the participants has been constant that attorney Brodsky made no objection, contemporaneously or otherwise, to the order. At 246 F.Supp. 366 Brodsky had no personal recollection of what had happened, at 39 F.R.D. at 573 it is stated that "he knowingly did not object," and at 271 F.Supp. at 495 he testified that he thought that an objection on his part would be unavailing and would have been overruled, so he made none. His testimony, quoted by the majority, was that

5. Justice Harlan's definition of a "public trial" in Estes v. Texas, *supra*, is, as far as I have discovered, the latest U.S. Supreme Court pronouncement on the subject, but prior to 1965 there had been conflicts in the state courts and inferior federal courts as to the meaning of the phrase. The narrowest view had been that only a limited number of spectators need be present in addition to those persons necessary to conduct the trial, e.g., Reagan v. United States, 202 F. 488, 44 L.R.A.,N.S., 583 (9 Cir. 1913) (those necessary to conduct of trial plus members of the bar); Robertson v. State, 64 Fla. 437, 60 So. 118 (1912) (those necessary for conduct of the trial plus those interested in the case); State v. Nyhus, 19 N.D. 326, 124 N.W. 71, 27 L.R.A., N.S., 487 (1909) (those necessary for conduct of the trial plus bar, witnesses and anyone the parties desire present); Grimmett v. State, 22 Tex.App. 36, 2 S.W. 631 (1886) (only officers, jurors and counsel allowed to be present); State v. Smith, 90 Utah 482, 62 P.2d 1110 (1936) (those necessary to conduct of trial plus bar, press, relatives and friends of accused). The broader view had required that the trial be left open to everybody, e.g.. Davis v. United States, 247 F. 394, L.R.A.1918C, 1164 (8 Cir. 1917) (one which the public is at liberty to attend); State v. Hensley, 75 Ohio St. 255, 79 N.E. 462, 9 L.R.A.,N.S., 277 (1906) (one open to the observation of all and not limited to any particular class of the community); Fields v. Ohio, 4 Ohio N.P.,N.S., 401, 17 Ohio Dec. 16 (C.P.1906) (one to which any proper person may have admittance). Here, if the facts as found by Judge Foley are accepted, everyone, including the press, was excluded during almost all of the trial and hence even under the narrowest view the accused's constitutional right was summarily violated. The approved federal rule would appear to be the one set forth in Davis v. United States, *supra*. There it was held that the defendants had been deprived of a public trial under the Sixth Amendment, even though their relatives, members of the bar and newspaper reporters were permitted to remain because other decorous persons had been excluded. Our Circuit recognizes that a trial judge must have power to exclude disorderly and disruptive spectators, as in United States ex rel. Orlando v. Fay, *supra*, where the history of the right of one accused to a public trial was reviewed and the authoritative learning in In re Oliver, *supra*, reiterated, even though a "public trial" is thereby denied. Here, admittedly, there was no disorder.

he "offered no objection when the courtroom was cleared of spectators in the belief that an objection under the circumstances, which were known to deponent (Brodsky) would be neither warranted nor sustainable."

Inasmuch as I believe that Judge Foley's findings of fact are not "clearly erroneous" and as I believe these findings demonstrate, without peradventure of doubt, that the clearing of the courtroom by the trial judge was arbitrary, prejudicial to the defendant, and not within the outer perimeter of the fair exercise of a trial judge's discretion, it has become necessary for me to discuss whether attorney Brodsky's failure to object constituted a waiver imputable to the accused so as to constitute a waiver by the accused himself of his constitutional right, under the Sixth Amendment, to a public trial.

With reference to the issue of whether attorney Brodsky, by failing to object, effectively waived petitioner's right to a public trial, the majority opinion does little to clarify the problems created by the relation between Fay v. Noia, *supra*, and Henry v. Mississippi, *supra*. In *Henry* there is no mention of a limitation on *Noia*, and it seems likely that some indication to that effect would have been stated if that had been the Court's intent, particularly as Mr. Justice Brennan wrote both opinions. See Ledbetter v. Warden, 368 F.2d 490, 494 (4 Cir. 1966). But see Nelson v. California, 346 F.2d 73 (9 Cir. 1965), cert. denied, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965). Here it is clear that petitioner was not asked to participate and did not participate in counsel's choice not to object. Therefore counsel's choice does not automatically bar petitioner from obtaining relief. See Fay v. Noia, 372 U.S. at 439, 83 S.Ct. 822. There is, of course, a legitimate interest in requiring a contemporaneous objection to a judge's trial ruling. But, when defense counsel fails to object and the objection violates the defendant's constitutional rights, there appear to be four variables that should be considered in adjudicating whether counsel's failure

is the equivalent of his client's intentional relinquishment of a known constitutional right.

These are (1) the nature of the right involved; (2) the degree of actual strategy that entered into counsel's decision; (3) the opportunity for and possibility of meaningful consultation between counsel and the accused as to the best course to follow; and (4) the degree of exceptional pressures or circumstances on either counsel or the accused which could dictate a choice of waiver. See, generally, Comment, "Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest," 54 Calif.L.Rev. 1262 (1966).

(1) The law already recognizes that certain rights may not be waived by counsel but can only be waived by the accused himself, e. g., the right to a trial by entering a plea of guilty, Fed.R.Crim. P. 11, United States v. Diggs, 304 F.2d 929 (6 Cir. 1962), see Brookhart v. Janis, 384 U.S. 1, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966); and the right to trial by jury, Fed.R.Crim.P. 23, United States ex rel. Goldsby v. Harpole, 263 F.2d 71 (5 Cir. 1959), cert. denied, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 (1959). Short of express statutory declarations, there have been many suggestions that there are definite distinctions among constitutional rights. Mr. Justice Frankfurter, for example, seems to have had a classification in mind when he wrote in his concurring opinion in Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953):

"Normally rights under the Federal Constitution may be waived at the trial, Adams v. United States ex rel. McCann, 317 U.S. 269 [63 S.Ct. 236, 87 L.Ed. 268], and may likewise be waived by failure to assert such errors on appeal. Compare Frank v. Mangum, 237 U.S. 309, 343 [35 S.Ct. 582, 593, 59 L.Ed. 969]. When a State insists that a defendant be held to his choice of trial strategy and not be allowed to try a different tack on State habeas corpus, he may be deemed to have waived his claim and thus have no right to assert on federal habeas cor-

pus. Such considerations of orderly appellate procedure give rise to the conventional statement that habeas corpus should not do service for an appeal. See Adams v. United States ex rel. McCann, *supra* [317 U.S.] at 274 [63 S.Ct. 236, at p. 239]. Compare Sunal v. Large, 332 U.S. 174 [67 S.Ct. 1588, 91 L.Ed. 1982], with Johnson v. Zerbst, 304 U.S. 458, 465–469 [58 S.Ct. 1019, 1023–1025, 82 L.Ed. 1461]. *However, this does not touch one of those extraordinary cases in which a substantial claim goes to the very foundation of a proceeding, as in* Moore v. Dempsey, 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543]. Cf. Ex parte Lange, 18 Wall. 163 [21 L.Ed. 872]; Ex parte Royall, 117 U.S. 241 [6 S.Ct. 734, 29 L.Ed. 868]." Id. at 503, 73 S.Ct. at 444. (Emphasis supplied.)

This Court made the same observation in quoting this passage approvingly when Noia's case was before us. United States ex rel. Noia v. Fay, 300 F.2d 345, 350–351 (2 Cir. 1962). See also, Reitz, "Federal Habeas Corpus: Impact of an Abortive State Proceeding," 74 Harv.L.Rev. 1315, 1333–35 (1961); Comment, 54 Calif.L.Rev., *supra* at 1267–69; Comment, State Criminal Procedure and Federal Habeas Corpus, 80 Harv.L.Rev. 422, 435 (1966).

(2) A second important consideration in determining whether defense counsel's failure to act is sufficient to constitute a binding waiver by the accused is the degree to which the failure to act was a strategic choice. This is clearly underscored in *Henry* by the United States Supreme Court's remand of that case to the Supreme Court of Mississippi for the state court to determine whether strategy was there involved. The negative implication of this remand must be that there is a waiver imputable to the accused only when his counsel's decision is a deliberate one made by counsel affirmatively to enhance, in counsel's judgment, the accused's chances, and that just a mere default by counsel is not imputable to an accused as a waiver of his rights.

The Court thus established a two-step process: first, it determined that the attorney's decision not to object to the alleged violation of the accused's rights could have been a tactical one—it even listed several possible strategic reasons at 379 U.S. at 451, 85 S.Ct. 564—and then it remanded the case back to the state court for a determination by that court as to whether counsel really made a planned decision, and whether the decision, if planned, was actuated by trial strategy. The same two-step process must now be followed by a U. S. district court in deciding the issue when presented, as here, upon a habeas petition.

Several courts have similarly emphasized the need for a deliberate choice on the part of counsel, e. g., Ledbetter v. Warden, *supra*; United States ex rel. Gockley v. Myers, 378 F.2d 398 (3 Cir. 1967); Whitus v. Balkcom, 333 F.2d 496, 502 (5 Cir.) cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964); and so have many of the commentators, e. g., Wright and Sofaer, "Federal Habeas Corpus for State Prisoners: The Allocation of Fact-Finding Responsibility," 75 Yale L.J. 895, 961, 979; Note, 40 N.Y.U.L.Rev. 470–471 (1966); Comment, "Negro Defendants and Southern Lawyers: Review in Federal Habeas Corpus of Systematic Exclusion of Negroes from Juries," 72 Yale L.J. 559, 566–571 (1963) (quoted approvingly in *Whitus supra*).

(3) A third variable in determining the issue of imputed waiver is the opportunity for and the possibility of meaningful consultation between the accused and his attorney. Trial counsel ought not to be required to consult with his client on all matters of trial strategy. This is so in order to further trial progress, but more importantly because an attorney's trained knowledge will most often be based on a sounder understanding of strategy and procedure than the understanding of his client. See Nelson v. California, 346 F.2d 73 (9 Cir.) cert. denied, 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed. 2d 367 (1965). Indeed, the average de-

fendant is probably unable to make an intelligent waiver, for example, of his privilege against self-incrimination because he lacks an understanding of the possible effects of such a decision in terms of the breadth of cross-examination, of impeachment, of the introduction against him of a prior criminal record, and the like. See People v. Shields, 232 Cal.App.2d 716, 42 Cal.Rptr. 188 (1965).

These justifications for exclusive attorney courtroom control do not insulate participation of the accused from all courtroom situations, however. Oftentimes, the problem to be solved is simple enough for the average defendant to comprehend it and little or nothing in terms of trial strategy is involved in resolving it. As one respected federal judge has concluded:

> " * * * important rights are often lost, however, when trial strategy is not involved. There is no reason to give attorneys more power to waive defendants' rights than they need in order to represent their clients effectively. When the decision to be made does not require a speedy judgment or involve factors which are beyond the ordinary defendant's ability to understand, consultation should normally be necessary." Wright and Sofaer, *supra* at 973.

See also, Comment, 54 Calif.L.Rev. *supra* at 1269–76. But see Nelson v. California, *supra*. Cf. Ledbetter v. Warden, *supra*.

(4) Finally, there is a factor which does not differentiate between personal bypasses and the bypasses of counsel, but instead holds that a bypass is a violative one in either circumstance. This is the factor applicable when there have been exceptional pressures on the defendant or his counsel to forego his right, or, in a trial, to forego protecting against loss of the right. The two leading examples are

Fay v. Noia, *supra,* and Whitus v. Balkcom, *supra*. In the former the defendant deliberately forewent his right to appeal. The Supreme Court held, however, that this decision was not "merely tactical," 372 U.S. at 440, 83 S.Ct. 822, because Noia's decision was based on a fear of receiving a heavier sentence after a second trial if his original conviction should be set aside.[6] In *Whitus* defense counsel made the deliberate choice of not objecting to the intentional exclusion of Negroes from the jury in his Negro client's southern trial because he feared the hostility of the judge, jury, and community, which could have eliminated his chances of success at trial. In *Whitus*, the Court held that under such "exceptional circumstances," a deliberate waiver for habeas corpus purposes would not be implied, 333 F.2d at 505–509, a holding that was approved in Henry v. Mississippi, *supra,* 379 U.S. at 451, 85 S.Ct. 564.

I turn now to an analysis of the present case in terms of these factors. The most striking aspect of the alleged waiver here seems to me to be the complete absence of the possibility of there being a strategic choice on the part of counsel in failing to object to the order excluding the spectators. The defense attorney stated that he believed an objection would be neither warranted nor sustainable, but surely the negative implication of the remand in Henry v. Mississippi, mentioned *supra* at p. 139 indicates that such a determination is not enough to constitute a waiver by counsel of his client's right. The view of the majority of the Supreme Court there, backed by the weight of the commentators, is that counsel's choice not to object does not constitute his client's waiver of a constitutional right unless the choice was "a voluntary choice between two meaningful alternatives." Comment, 72 Yale L.J., *supra* at 567 n. 34. See Wright and Sofaer, *supra* at

---

6. The Court did state that it was not holding that there could never be a deliberate bypass so as to constitute a true waiver when the right to appeal was not availed of because of a fear of a heavier sentence on retrial. It said each case should be judged on its own special facts. Noia's bypass was held not to be a deliberate one because his fears were more meaningful because of the language used by the judge in sentencing him. 372 U.S. at 440, 83 S.Ct. 822.

961–979; Note, 40 N.Y.U.L.Rev. at 470–471 (1966).

In the present case, counsel did not have meaningful alternative choices because nothing could be gained by not objecting, especially if the objection was made out of the presence of the jury.[7] As for counsel's belief that his objection would not be sustainable, that should be of no concern to us. If his belief was incorrect, his action was a default of his client's rights, and the clear implication of *Henry* is that such a default is not a waiver. On the other hand, if his belief was correct at the time it was made but there would be a different result today, the situation is analogous to the one faced by us and several other Courts of Appeal which have held that it was not a waiver of his client's constitutional rights to fail to object to a violation of a right that counsel could not have known existed when he failed to object. E. g. United States ex rel. Floyd v. Wilkins, 367 F.2d 990 (2 Cir. 1966); Ledbetter v. Warden, *supra*; and Dillon v. Peters, 341 F.2d 337 (10 Cir. 1965).

And, of course, overlapping the above discussion is the additional consideration that whether to object to the clearing of the courtroom is a decision that was clearly within the comprehension of the average defendant such as the defendant here. Though most defendants might not understand, for example, the full implications of a decision whether to object to the introduction of certain evidence, they could understand what could be gained or lost by not objecting to the exclusion of one's family and friends, and the press, from the courtroom.

Correspondingly, to require counsel to confer with the defendant on this question would not normally be a serious encroachment on counsel's professional responsibility to control the conduct of the lawsuit. Because a question of strategy would rarely be involved in a consideration of this matter, and because the defendant could participate effectively in the making of the decision, there seems to be no justification for holding that the accused's rights to have his family and friends observe the trial were waived by him when he was never consulted about it.

The right to a public trial is one of the most basic liberties guaranteed by the Bill of Rights. Indeed, as one commentator states, it seems "analogous to the right of trial by jury, waiver of which was held to require the 'express and intelligent consent of the defendant' even prior to the adoption of Rule 23(a) of the Federal Rules of Criminal Procedure, which requires a written waiver." Note, "The Right to a Public Trial in Criminal Cases," 41 N.Y.U.L.Rev. 1139, 1148 (1966), quoting from Patton v. United States, 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930). The rationale for the rule was well expressed by Justice

---

7. There is a suggestion in the testimony of the two state judges that the exclusionary order may have been talked over in chambers prior to the taking of the stand by DiBari. There is also a hint that defense counsel was informed and consulted with and that he made no objection at that time, even that he may have affirmatively agreed to the coming exclusion order.

In any event, the testimony of all three does indicate, despite the colorful testimony of Judge Leibowitz that he made a sudden decision, that the exclusionary order had been contemplated prior to its issuance. Therefore, if this be so, counsel had plenty of time in which to talk over with his client the anticipated order. If the order was not earlier contemplated and came to experienced defense counsel as a surprise, he could have objected to it in several ways without incurring the displeasure of the jury, as by requesting a side bar *sotto voce* discussion at the bench or by asking for a short recess while he made his objection to the court in the robing room or by asking that the jury be excused while he made the objection in open court. Moreover, it took time to clear out the thirty or more spectators who were sitting in the seats reserved for spectators behind the rail regardless of whether the "second jury box" was ordered cleared, and during this period counsel could well have discussed with his client whether to make an objection to the unconstitutional deprivation.

Black in In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948):

"Whatever other benefits the guarantee to an accused that his trial be conducted in public may confer upon our society, the guarantee has always been *recognized as a safeguard against any attempt to employ our courts as instruments of persecution.* The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." 333 U.S. at 270, 68 S.Ct. at 506.

See authorities cited *id.* at 270 n. 25, 68 S.Ct. at 506. Therefore, when a right as basic as this one is involved, there is sound reason to require that counsel consult with the accused before choosing not to insist that his client enjoy the benefit of it.

In the closing sentence of the majority opinion, there is an implication that petitioner must produce specific proof of specific prejudice before he may claim that because he did not have a public trial he suffered a meaningful deprivation. Contrariwise, I maintain, as the Eighth Circuit maintained as early as 1917, that when the right to a public trial has been violated the

" * * * violation of the constitutional right necessarily implies prejudice and more than that need not appear. Furthermore, it would be difficult, if not impossible, in such cases for a defendant to point to any definite, personal injury. To require him to do so would impair or destroy the safeguard."

Davis v. United States, 247 F. 394, 398–399, L.R.A.1918C, 1164 (8 Cir. 1917). Accord: United States v. Kobli, 172 F.2d 919, 921 (3 Cir. 1949) ; Tanksley v. United States, 145 F.2d 58, 59, 10 Alaska 443, 156 A.L.R. 257 (9 Cir. 1944). See also Note, 41 N.Y.U.L.Rev. *supra* at 1149; Note, 49 Colum.L.Rev. *supra* at 118.

Lastly, here there were no exceptional circumstances or pressures of the sort encompassed within the fourth variable.

On the basis of the above analysis, I submit that there was no intentional relinquishment by petitioner of his right to a public trial imputable to him because of the failure of his counsel to object to the exclusionary order.

The fact that defense counsel knowingly did not object to the exclusion order does not support a claim that petitioner, himself, also knowingly failed to object. We are instructed that we may not presume that an accused has, by his silence, waived a fundamental constitutional right and are instructed that we should indulge every reasonable presumption against such a waiver. Carnley v. Cochran, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962).

I would affirm Judge Foley.