Lloyd Eugene BROFFORD,
Petitioner-Appellant,

v.

Ronald C. MARSHALL,
Respondent-Appellee.

No. 84–3463.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 14, 1984.

Decided Jan. 8, 1985.

Rehearing and Rehearing En Banc
Denied Feb. 21, 1985.

Edward Marek, Federal Public Defender, Donald Krosin (argued), Cleveland, Ohio, for petitioner-appellant.

Anthony J. Celebrezze, Atty. Gen. of Ohio, Christine Manuelian, Asst. Atty. Gen. (argued), Columbus, Ohio, for respondent-appellee.

Before MERRITT and KENNEDY, Circuit Judges, and PRATT, District Judge.*

CORNELIA G. KENNEDY, Circuit Judge.

This is an appeal from the District Court's denial of appellant Brofford's petition for a writ of habeas corpus.

### Facts

Brofford's appeal stems from his conviction for the January 15, 1980, murder of Officer David Alcox of the Oak Hill, Ohio, Police Department. Shortly after 8:00 p.m. on the day in question, Brofford was stopped for a traffic violation by Alcox. While running a license check, Alcox was notified by the police dispatcher that there was a parole warrant out for Brofford. Alcox failed to acknowledge the transmission, at which time patrol cars were immediately dispatched to the scene. Upon their arrival, police officers found Alcox lying on his back beside the passenger door of his cruiser, dead from a bullet wound to his chest.

Brofford was apprehended that evening at a roadblock following a high speed chase. As he was searched, Brofford indicated the location, in his right pocket, of the murder weapon. In response to a cautionary statement from arresting officer Smith to other officers on the scene that

---

* The Honorable Philip Pratt, United States District Court for the Eastern District of Michigan, sitting by designation.

they should search the suspect carefully because the victim's gun was missing, Brofford volunteered that the gun was in his truck, whereupon Smith looked in the truck and found Alcox's gun and citation book, containing a partially completed traffic ticket made out to Brofford.

There were two witnesses to the shooting, Juanita Runyon and her son Jerry, who were passengers in Brofford's truck at the time he was stopped by Alcox. Both testified that upon being stopped, Brofford put the truck in park, left it running with the lights on, got out and walked back to the cruiser, and sat down on the passenger side of the officer's automobile. A few minutes later, Brofford returned to the truck, turned off the lights, and told Juanita to keep the motor running. As Brofford went back to the cruiser, Juanita turned and saw Brofford and Alcox facing each other and talking. Just before turning away, she saw Alcox outstretch his left hand. At that moment, Jerry heard two gunshots. Brofford came back to the cruiser, blood on his hands, and threw Alcox's citation book in Juanita's lap and revolver on the dash, stating "that's not my blood, that's from him, I shot the son of a bitch." In addition, several witnesses testified that they either saw or heard Brofford's truck speeding away from the scene, one man stating that he had heard two gunshots immediately beforehand. Various items of physical evidence conclusively linked Brofford to the crime as well, including gunshot residue on his hands detected by tests performed immediately after his arrest.

The murder in question occurred in Jackson County, Ohio, a rural county with approximately 30,000 residents. Prior to trial, petitioner's counsel moved for a change of venue based upon prejudicial pretrial publicity in the news media in and around Jackson County. This motion was taken under advisement by the trial court pending efforts to empanel an unbiased jury.

Brofford's trial began March 24, 1980. Just before the panel of prospective jurors entered the courtroom, the trial judge overruled counsel's objection to the defendant being restrained in leg irons in the courtroom. Voir dire consumed approximately three hours, during which time twenty-three prospective jurors were examined in selecting a jury of twelve and one alternate. At the close of voir dire, petitioner renewed his motion for a change of venue. The motion was denied. On March 27, the jury returned a verdict of guilty of aggravated murder, and Brofford was sentenced to life imprisonment.

Appellant raises eight arguments in support of his habeas petition:

1. The trial court erred in overruling Defendant's Motion for a Change of Venue thereby denying the Defendant the right to a fair and impartial trial.

2. The trial court erred in overruling Defendant's Motion for Acquittal at the close of the State's case for the reason that the State of Ohio had failed to prove each element of Section 2903.01 of the Ohio Revised Code.

3. The trial court erred in overruling Defendant's Motion to Dismiss for the reason that the Grand Jury was not properly empaneled.

4. The trial court erred in overruling Defendant's Motion to Suppress Evidence thus violating the Defendant's right to privacy.

5. The trial court erred in its charge to the jury.

6. The trial court erred in excluding defense evidence.

7. The trial court erred in permitting the Defendant to be shackled with leg irons during the trial.

8. The trial court erred in permitting the prosecution to admit into evidence a photograph which was not submitted to the defense pursuant to discovery.

Each of these contentions was rejected by the Ohio Court of Appeals, and petitioner's motion for leave to appeal to the Ohio Supreme Court was denied.

## Discussion

### 1. Prejudicial Pretrial Publicity

■ The method employed by the trial court for selecting the jury was to bring in a panel of twelve prospective jurors, conduct voir dire examinations of the panel both collectively and individually with the entire panel present, and replace those excused as necessary. The judge began by asking the panel whether any of its members knew or had any dealings with the attorneys in the case, the defendant or the victim. He then questioned the panel generally regarding their awareness of the case as reported in the media, admonishing them that the case was to be decided solely on the evidence as presented during the trial and the law as explained by the court, and asking that anyone unable to do so identify themselves. As each new person was added to the panel, the judge would put to that person individually an equivalent series of questions. Counsel questioned the veniremen individually as well. In particular, defense counsel was permitted to probe the source and extent of each prospective juror's knowledge of the crime and preconceptions as to the defendant's guilt or innocence.

Of the twenty-three prospective jurors examined, nineteen were asked in their individual voir dire if they had read or heard about the case. All responded that they had. Eighteen were asked if they had discussed the case before being summoned. Fifteen responded affirmatively. Twenty were asked if they had an opinion as to the guilt or innocence of the defendant as a result of pretrial exposure to reports of the case. Twelve responded that they had such an opinion.

Of the jurors selected, including the alternate, each one had read or heard about the case. Nine stated that they had discussed the case prior to being summoned as jurors, three state that they had not, and one was not asked. Nine stated that they had formed an opinion from what they had read or heard that the defendant was guilty, but all of those stated that they could set that opinion aside. Defense counsel exercised all of his peremptory challenges, and was not permitted to challenge for cause solely on the basis that a prospective juror admitted to having a preconceived notion that the defendant was guilty, if that juror said he or she could put that notion aside. In particular, appellant notes the statement of juror Evans:

> MR. DOUTHETT: Okay now based on the evidence adduced at trial, can you put this preconceived notion aside and if the State does not sufficiently prove its case, find in favor of the defendant, in spite of your predisposition towards guilt? .... Mr. Evans?
>
> MR. EVANS: I would unless there's ... I could not say the man is innocent unless I hear a different evidence from what I read in the papers.
>
> MR. DOUTHETT: Are you saying ...
>
> BY THE COURT: Well, let me talk to him for a minute. Now sir, you're going to hear throughout the course of this case that I'm going to tell you that every person ... you, this defendant, or anybody else, is presumed to be innocent until the State proves him guilty beyond a reasonable doubt, and you'll learn at other times in the trial what that definition is. Now what the question is: if the State fails to prove him guilty beyond a reasonable doubt as required by law, would you be willing to render a verdict of not guilty?
>
> MR. EVANS: Yes sir.
>
> BY THE COURT: All right.

The court subsequently overruled a challenge of Mr. Evans for cause made by defendant.

In *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), the Supreme Court struck down a state capital conviction solely on the ground of prejudicial pretrial publicity. Six murders had been committed in Vanderburgh County, Indiana. Shortly after petitioner was arrested, the county prosecutor and local police officials issued press releases, which were intensively publicized. Headline stories announced that petitioner had confessed to

the six murders and to twenty-four burglaries (the *modus operandi* of these crimes was compared to that of the murders and the similarity noted). Reports that the petitioner had offered to plead guilty if promised a ninety-nine year sentence, but that the prosecutor was determined to secure the death penalty, were widely circulated. In many of the newspaper stories petitioner was described as the "confessed slayer of six," a parole violator and fraudulent check artist. Petitioner sought a change of venue, which was granted, but to an adjoining county. His request that venue be changed to a further removed county was denied. At trial, the jury panel consisted of 430 persons. Of these, 268 were excused for cause as having fixed opinions as to the guilt of petitioner. In all, 370, or approximately 90% of those examined on the point, "entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty." 366 U.S. at 727, 81 S.Ct. at 1645. Of those finally selected to serve on the jury, eight of twelve admitted that they thought petitioner was guilty, but stated that notwithstanding that opinion each could render an impartial verdict.

The Court held:

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression and render a verdict based on the evidence presented in court.

366 U.S. at 722–23, 81 S.Ct. at 1642 (citations omitted). Applying this reasoning to the facts at hand, the Court concluded:

Here the "pattern of deep and bitter prejudice" shown to be present throughout the community, cf. *Stroble v. California,* 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed. 872] was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental process of the average man .... Two-thirds of the jurors had an opinion that petitioner was guilty and were familiar with the material facts and circumstances involved, including the fact that other murders were attributed to him, some going so far as to say that it would take evidence to overcome their belief .... No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.

366 U.S. at 727–28, 81 S.Ct. at 1645.

*Irvin* was distinguished by the Court in *Patton v. Yount,* —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). In 1966, Yount had been convicted of murdering one of his high school students, but his conviction was reversed on *Miranda* grounds. Before and during voir dire at his 1970 retrial, Yount moved for a change of venue, arguing that the widespread dissemination of prejudicial information could not be eradicated from the minds of potential jurors. The trial court denied the motions, and Yount was again convicted of first degree murder.

In 1981, Yount sought federal habeas relief, claiming that his conviction had been obtained in violation of his right to a fair trial by an impartial jury. The District Court denied relief on the basis that the pretrial publicity was not excessive and that jurors were able to set aside any preconceived notions of guilt. Relying on *Irvin*, the Third Circuit reversed.

In reversing the Court of Appeals, Justice Powell observed that the partiality of a juror is plainly a question "of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed," and as such was subject to the statutory presumption of correctness accorded under 28 U.S.C. § 2254(d) to factual findings of state courts on habeas review. 104 S.Ct. at 2891–92, 81 L.Ed.2d at 857. In doing so, he rejected the view of the Court of Appeals and that of the appellant in this case, based upon language in *Irvin*, that a federal court must "independently evaluate" voir dire testimony in reviewing questions of juror bias. 104 S.Ct. at 2889 & n. 7, 2891–92 & n. 12, 81 L.Ed.2d at 854 & n. 7, 858–59 & n. 12.

Justice Powell cited numerous factual distinctions between *Irvin* and *Patton* that he deemed significant. The extent of the publicity in *Patton* in the year and a half between reversal of the first conviction and voir dire in the second trial was insignificant, averaging less than one article per month. 104 S.Ct. at 2889, 81 L.Ed.2d at 854–55. Moreover, these articles were often brief and factual, rather than inflammatory. Voir dire indicated that the recollections and opinions regarding the case of those chosen as jurors had diminished with the passage of time. 104 S.Ct. at 2889–90 & n. 8, 81 L.Ed.2d at 855–56 & n. 8. While

they may still have recollected the crime, it was more likely that they would be able to judge the case impartially, and their statements to that effect were entitled to greater credence. 104 S.Ct. at 2890, 81 L.Ed.2d at 856. He rejected a challenge to one juror who had made a statement similar to that made by juror Evans in the instant case and quoted above, on the basis that such statements are not uncommon, and as in the instant case the trial judge had questioned the venireman further and reasonably had determined thereby that the prospective juror could decide the case impartially. 104 S.Ct. at 2893, 81 L.Ed.2d at 859. He also noted as significant but not controlling that while in each case the veniremen were examined individually by counsel, in *Irvin* the questioning took place in front of all those remaining in the panel, while in *Patton* the veniremen were brought into the courtroom individually for questioning. 104 S.Ct. at 2890 n. 10, 81 L.Ed.2d at 856 n. 10.

In some respects, the instant case seems closer to *Irvin* than *Patton*. The amount of publicity, the interval of time between the murder and the trial, the method of questioning the veniremen, and the number of jurors admitting to a preconceived notion of the defendant's guilt, seem to support appellant's position. Moreover, in both *Irvin and Patton*, the effort expended in voir dire was much more extensive than in this case. The jury in *Irvin* was selected from a panel of 430 and the record of voir dire examination ran 2,783 pages. In *Patton*, 292 veniremen were examined over ten days.

On the other hand, the publicity as described was much more inflammatory and prejudicial in *Irvin* than in the instant case.[1] Although the newspaper articles offered to and received by the trial judge in

1. Moreover, the Court repeatedly emphasized in *Irvin* that the defendant was on trial for his life, which was not the case here. *See also Press-Enterprise Co. v. Superior Court*, — U.S. —, 104 S.Ct. 819, 830, 78 L.Ed.2d 629 (1984) (Marshall, J., concurring) (observing that "this was a *capital* case involving an interracial sexual attack" (emphasis in original), in taking exception to comment in majority opinion that six week voir dire was too long). Whether that difference should affect the scrutiny given by a court to potential juror bias is problematic. *Cf. Groppi v. Wisconsin*, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971) (state law barring change of venue in misdemeanor cases regardless of local prejudice violates right to trial by impartial jury).

support of petitioner's motion for change of venue are not part of the record before this court, his own description of the contents of those articles contains nothing of a nature so inherently prejudicial that a juror would be unable to disregard it.[2] The nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered. *See Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In particular, knowledge that the defendant has confessed, prominent in *Irvin* and absent in this case, has always been regarded as especially prejudicial. *See, e.g., Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Goins v. McKeen,* 605 F.2d 947 (6th Cir. 1979). As to the time expended in jury selection, although the jury was chosen after examining just twenty-three veniremen over three hours, the total length of time expended is not logically related to whether each juror selected was thoroughly questioned or whether in each instance the record or circumstances would overcome the presumption of correctness afforded the trial judge's determination.[3] Most importantly, whether this case is more like *Irvin* or more like *Patton* is not really controlling. Since the determination of juror partiality is one of fact, implicitly each case must be evaluated on its own record and the surrounding circumstances.

Brofford also argues that the trial judge incorrectly assumed that a less biased jury could not be had if a change of venue were granted to any other county. In taking the defendant's pretrial motion for a change of venue under advisement, the judge observed:

> Well, the only way you can determine whether a fair and impartial jury can be impaneled is to start impaneling them. Sometimes, like a case I heard in Franklin County which had many, many more vociferous publications with reference to the matter up there, same type of case, a lot more pre-trial publicity, and yet when it came to impaneling a jury, strangely enough about two-thirds of them hadn't read anything about it. So it may be that there are a lot of people around the countryside and around the county of Jackson that don't have too much knowledge about the case or havn't [sic] formed any opinions concerning the same at all. So I think I would prefer to ... I won't overrule the motion at this time, I'll just take it under advisement until such time as the trial time arrives. If it would appear at trial that it's impossible to get a fair jury, then you can bring up the motion again and, if necessary, we can transfer the case at that time.

As it turned out, voir dire revealed that there weren't a lot of people around Jackson County who were unfamiliar with the case. Nevertheless, when the defendant renewed his motion after voir dire, it was overruled.

> BY THE COURT: [I]t seems that the jury is quite fair and impartial. We realize that people do not live in a vacuum any more with reference to communications, that they read and they hear, and this does not necessarily mean the defendant cannot have a fair and impartial

---

**2.** He emphasizes references in those articles to the fact that he was a parole violator and had served time in prison. However, testimony that at the time of the murder Brofford was being sought for having violated his parole was offered at trial without objection in the course of establishing the circumstances of his arrest.

**3.** *Cf. Press-Enterprise Co. v. Superior Court,* — U.S. ——, 104 S.Ct. 819, 824 n. 9, 78 L.Ed.2d 629, 638 n. 9 (1984) ("We cannot fail to observe that a voir dire process of such length," six weeks, "in and of itself undermines public confidence in the courts and the legal profession. The process is to ensure a fair and impartial jury,

not a favorable one."); Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 1350 (5th ed. 1980) (quoting Edward Bennett Williams from 17 Student L.J. 24 (1971)) (" 'There is no case, I suggest to you, that should require more than a day of jury selection. I watched the jury picked in a case that attracted more attention than any other on the face of the globe in the 1960's—the Stephen Ward case arising out of the Lord Profumo scandals in England. It took 30 minutes. I have never taken more than a day in any case to get a jury, and I have never lost a case because I didn't have time enough for jury selection.' ").

jury and I believe this is as impartial a jury as it's possible to get in the case.

MR. DOUTHETT: In this county.

COURT: Or any other county.

■ Appellee argues that the judge was correct, in that the publicity attendant upon a crime such as this one would have followed the case wherever it was tried, whether in a sparsely or heavily populated county. The point, however, is whether jurors were exposed to that publicity and prejudiced thereby. On the one hand, the judge's pretrial observation suggests that in a more heavily populated county such as Franklin County (approx. pop. 870,000), it is more likely that jurors can be found who are unfamiliar with even the most heavily publicized case. More importantly, if an unbiased jury cannot be empaneled, the Constitution requires that the case be moved. If it is moved once and an unbiased jury still cannot be empaneled, it must be moved again. *See Irvin*, 366 U.S. at 720–21, 81 S.Ct. at 1641. This requirement cannot be ignored on the basis of an unsupported assumption to the effect that "this is the best we can do." On the other hand, whatever assumptions the trial judge may or may not have made are irrelevant if, as he so found, a fair and impartial jury had been selected, and there is nothing in the record or surrounding circumstances of the case to overcome the presumption that his determination was correct. Moreover, it is quite possible that his reference to the jury being as impartial as it was possible to get in the case may have had nothing to do with the amount of publicity in the locale in which trial was had, but rather been in reference to the ubiquitous nature of the emotional reaction aroused against one accused of murdering a policeman.

Finally, appellant argues that affidavits submitted with his petition for a writ of habeas corpus raised sufficient doubt about the impartiality of the jury to warrant at least an evidentiary hearing, if not reversal of conviction. Two of these affidavits were by his mother and one of her friends, stating that as the judge asked the prospective jurors whether they could put aside what they knew and thought of the case, he was nodding his head "yes". The Magistrate, whose Report and Recommendation was adopted by the District Court, dismissed these affidavits on the basis that defendant's counsel had not objected to any suggestive nodding at the time, and because, given their source and timing, they "strain credulity to the breaking point." *See United States v. Hendrix*, 549 F.2d 1225, 1227–28 (9th Cir.) (held District Court must consider source of allegations of juror bias, in case in which defendant's wife and mother-in-law claimed juror during trial had made comments to them revealing bias), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977).

More problematic is the third affidavit, purportedly of Nora Lee Ramsey, Juror # 4 at appellant's trial. She states:

1. I was on the jury that returned the verdict of guilty against the defendant Lloyd E. Brofford in the murder trial of Dave Alcox in March 27, 1980.

2. I was asked if I had read anything about the case in the news papers and heard it on the radio and I stated yes.

3. I was asked if I felt at that time if the defendant was guilty and I answered yes.

4. I was asked if I could put aside my preconceived notions that the defendant was guilty before trial started and I said yes.

5. I had it in my mind that the defendant was guilty before trial had started, the same as the other jurors had.

6. From what I had read in the news papers and heard on the radio I could not have found the defendant not guilty.

7. I felt the same as the other jurors had that the defendant was guilty of the murder of Dave Alcox because of what I had read in the news papers and heard on the radio.

8. I also state that by me signing by name below it is just the same as if I had this statement notarized.

As suggested by recital 8, this "affidavit" was not notarized.[4] The Magistrate regarded this statement as "curious indeed. Juror Ramsey now says, but will not swear before this Court, that she perjured herself before the trial court. If she is unwilling to expose herself to the contempt power of the Court, perhaps because of its proximity, then we must hold her belated efforts on behalf of the petitioner to be of little consequence."

Fed.R.Evid. 606(b) states in part that "a juror may not testify as to ... the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith." The Magistrate apparently assumed that this rule was inapplicable to the Ramsey "affidavit" because it pertained to whether she had lied during voir dire. *See* 3 Weinstein's Evidence ¶ 606[04], at 606-33 ("Where the comments indicate that the juror had preconceived notions of liability or guilt or personal knowledge about the fact in issue, the statements may be admissible not because they are not prohibited by Rule 606(b), but as tending to prove that the juror lied on voir dire, a separate question from that of impeachment of verdicts."). It is less than clear, however, that this assumption is correct. Upon closer examination her "affidavit" may be read as stating that ultimately she found during deliberations that she was unable to set aside what she had read and heard about the case, not that she was lying when she stated during voir dire that she could.

 The cases in which juror statements have been considered generally have involved deliberate or inadvertent nondisclosure of pertinent historical facts during voir dire; courts have been much more hesitant to consider statements that jurors failed to put personal prejudices aside during deliberations. *See, e.g., United States v. Duzac,* 622 F.2d 911, 913 (5th Cir.), *cert. denied,* 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). *But cf. Tobias v. Smith,* 468 F.Supp. 1287 (W.D.N.Y.1979) (statements of racial prejudice made by jurors during deliberations). The predominant interpretation of the language quoted above from rule 606(b) is that "even when the juror is testifying about extraneous information or an outside influence, he may not be interrogated about its impact." 3 Weinstein's Evidence ¶ 606[05], at 606-40 & n. 4 (1982 & Supp.1984). Since juror Ramsey's "affidavit" admits that she told the judge that she knew and had formed an opinion about the case, her contention that she was prejudiced thereby may be regarded as incompetent testimony regarding "the effect of anything upon his or any other juror's mind or emotions," rather than evidence that she committed perjury during voir dire.

 It is a matter within the discretion of the district court whether a habeas petitioner is entitled to an evidentiary hearing. *Riley v. Lockhart,* 726 F.2d 421, 423 (11th Cir.1984). It is also a matter for the court's discretion whether to admit and receive affidavits as evidence. *United States ex rel. Bruno v. Herold,* 246 F.Supp. 363, 365 (N.D.N.Y.1965), *aff'd on rehearing,* 271 F.Supp. 491 (N.D.N.Y.1967), *rev'd,* 408 F.2d 125 (2d Cir.1969), *cert. denied,* 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970). Petitioner argues that the District Court could have convened an evidentiary hearing to which juror Ramsey could have been subpoenaed, placed under oath, and given testimony subject to the contempt powers of the court. Given that the burden rests with the habeas petitioner to demonstrate that he was denied a fair trial because of jury bias, *Goins v. McKeen,* 605

---

**4.** *Cf. Cord v. Smith,* 370 F.2d 418, 420 n. 1 (9th Cir.1966) (unnotarized "declaration" stating that is made "under penalty of perjury" is not a proper affidavit in a federal court); *United States v. Jones,* 520 F.Supp. 842, 845-46 (E.D.Pa.

1981) (statement of defense attorney alleging that after trial one juror had made a statement to him that another juror was biased insufficient without juror's affidavit to warrant further consideration).

F.2d at 951, it can hardly be said that the District Court abused its discretion in holding that the unnotarized statement attributed to juror Ramsey was insufficient to warrant an evidentiary hearing. *See Wright v. United States,* 559 F.Supp. 1139, 1151–52 (E.D.N.Y.1983) (clear, strong, substantial evidence of possibility of juror bias necessary to justify evidentiary hearing). It is also noteworthy that the appellant either has not attempted or has been unable to obtain a notarized affidavit of juror Ramsey since the District Court denied his petition. *Cf. United States v. Wilson,* 534 F.2d 375, 379 (D.C.Cir.1976) (it was within discretion of trial judge to determine what manner of hearing, if any, was required, on juror's post-trial claim of irregularity; no abuse of discretion not to proceed further after juror failed to appear at scheduled meeting and appellant's counsel took no further action).

### 2. Shackling of Petitioner in Leg Irons During Trial

Before the panel of jurors was brought into the courtroom for voir dire, the trial court overruled the motion of defense counsel objecting to petitioner being restrained by means of leg irons. The only support in the record for this decision is the trial judge's statement in overruling the motion that

> in view of the seriousness of the offense, including some past record of the defendant of which I'm aware, and upon the recommendation of the Sheriff's Department, I think the leg irons will remain. They're fairly unobtrusive. I have agreed to the fact that the defendant should have his hands free to make notes or anything else and not be fettered in, · that fashion, but I think for security purposes, I think they shall remain.

■ Petitioner contends that since no hearing was held on the necessity of physical restraints and the bare statement of the trial judge is insufficient to constitute a record upon which the habeas court can review his finding, the determination that

the need for security overrode the possibility that the leg irons would have a prejudicial effect upon the jury is not entitled to a presumption of correctness under 28 U.S.C. § 2254(d).

This court discussed the legal principles within which the trial court must exercise its discretion in physically restraining a defendant for security reasons in *Kennedy v. Cardwell,* 487 F.2d 101 (6th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). The court held that only on a showing of clear necessity, in extraordinary circumstances and as a last resort should shackles ever be employed, and that it is preferable that a formal hearing be conducted with sworn testimony to resolve factual disputes and preserve a meaningful record for appeal or collateral relief. 487 F.2d at 110–11. In *Kennedy,* the fact that the defendant had escaped twice previously from jail, and the recommendations of the sheriff with respect to the defendant and the security of the courthouse, were apparently a matter of record, although no formal hearing had been conducted. The trial judge had overruled defendant's objection to the use of restraints, giving him the option of either handcuffs or leg irons, and stated his reasons as follows:

> Upon the record of this defendant, and further taking into consideration the nature of the charge herein and the experience of our police officials with the defendant together with all other relevant facts and circumstances, including but not limited to the somewhat desperate situation involving the temperment and personal characteristics of the defendant, the Court believes and does find that the shackling of the defendant at all times during trial is necessary to prevent violence and escape.

487 F.2d at 104. Noting that the burden of proof was upon the petitioner in a habeas proceeding to establish that his constitutional rights were violated by manacling, 487 F.2d at 111,[5] the court held that peti-

---

5. *See also Payne v. Smith,* 667 F.2d 541, 543–45

(6th Cir.1981), *cert. denied,* 456 U.S. 932, 102

tioner had not sustained this burden and that the trial judge had not abused his discretion in permitting the use of restraints. *See also Zygadlo v. Wainwright,* 720 F.2d 1221 (11th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984).

By contrast, in *Woodards v. Cardwell,* 430 F.2d 978 (6th Cir.1970), *cert. denied,* 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971), this court held that the trial judge had abused his discretion in allowing the defendant to be shackled during trial. More accurately, the court found that the trial judge had simply deferred to the wishes of the sheriff and not *exercised* his discretion. 430 F.2d at 981. The court also found it "regrettable that more facts surrounding the decision to keep petitioner shackled during trial were not preserved in the record of the trial court." 430 F.2d at 982. As to the prejudicial nature of the restraints, it is noteworthy that in *Woodards* the defendant was more heavily restrained than either Brofford or the defendant in *Kennedy,* by both handcuffs and a belt about the waist, and that "while some effort was made to keep the jurors from constant awareness of the manner in which petitioner was shackled, they could not avoid observing his wearing of the restraints." 430 F.2d at 980.

While it would be preferable if the trial judge had produced a more complete record of the grounds upon which he made his decision, it is clear that he was doing more than simply deferring to the sheriff. In *La Vallee v. Delle Rose,* 410 U.S. 690, 93 S.Ct. 1203, 35 L.Ed.2d 637 (1973), and *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983), the Supreme Court considered the question of what constitutes a record sufficient to support the presumption of correctness accorded state court factual findings under 28 U.S.C. § 2254(d). Those cases hold that if the state court has applied the proper legal standard, and it can be inferred in the absence of explicit findings of fact that its result was supported implicitly by the record or surrounding circumstances in the case, then the presumption will apply.[6] Both of these requirements are satisfied by the statement made by the trial judge in this case in overruling defendant's motion.[7]

S.Ct. 1983, 72 L.Ed.2d 449 (1982). Petitioner quotes language from *United States v. Crane,* 499 F.2d 1385, 1389 (6th Cir.), *cert. denied,* 419 U.S. 1002, 95 S.Ct. 322, 42 L.Ed.2d 278 (1974), for the proposition that the state has the clear burden of proving that the defendant was not prejudiced by the shackling. It is clear, however, from the court's statement in *Kennedy* that the burden was on petitioner to show that his constitutional rights were violated, and from the cited discussion in *Payne v. Smith,* that the burden referred to in *Crane* must be the initial burden on the state to justify that shackling is the least prejudicial means by which security can be ensured.

**6.** In *Marshall v. Lonberger,* the issue was, in the absence of a reviewable record whereby the habeas court could determine whether a guilty plea in a prior case in Illinois was knowing and voluntary, whether the conclusion of the Ohio trial court that the plea was knowing and voluntary was fairly supported by the record. The Court held:

> Thus, the factual circumstances which the federal habeas courts were bound to respect in assessing respondent's constitutional claims were the contents of the Illinois court records, the finding of the Ohio trial court that respondent was "an intelligent individual, well experienced in the criminal processes and well

represented at all stages of the proceedings by competent and qualified counsel in Illinois," *supra,* at 428, 103 S.Ct. at 847, and the similar conclusion of the Ohio Court of Appeals, *and the inferences fairly deductible from these facts.*

459 U.S. at 435, 103 S.Ct. at 851 (emphasis added).

**7.** It is true that in *Kennedy v. Cardwell,* an evidentiary hearing had been conducted by the district court, and this court held that on collateral attack, the reviewing court should make factual findings including whether there is support for the trial court's assertions pertaining to the propensities of the defendant, and whether the courthouse and courtroom layout would accommodate less drastic security measures. 487 F.2d at 110–11. The Supreme Court has subsequently made clear, however, that if the state court findings are entitled to the presumption of correctness afforded by 28 U.S.C. § 2254, then such a *de novo* factual inquiry would fail

> to accord those determinations the "high measure of deference," *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982), to which they are entitled....

> We greatly doubt that Congress, when it used the language, "fairly supported by the

Appellant makes the additional argument that the combined prejudicial effect on the jurors of the pretrial publicity plus shackling of the defendant in this case is far greater than the sum of its parts. Courts have considered the cumulative effect of individual allegations of prejudice. *See, e.g., United States v. Richardson,* 651 F.2d 1251, 1253 (8th Cir.1981) (although trial judge scrupulously questioned and admonished jurors regarding publicity, "the 'collective impact,' *United States v. Titsworth,* 422 F.Supp. 587, 591 (D.Neb.1976), of prejudicial in-trial publicity and the appearance of the wounded witness testifying from the wheelchair adversely affected the case for the defense, and the trial court abused its discretion in failing to grant a mistrial"). Nevertheless, the argument is illogical in this case. Given that a fair and impartial jury was selected and that the trial judge was justified in permitting the defendant to be restrained with leg irons for security reasons, any additional prejudice is inherent in the determination that such a restraint is unavoidably necessary. It is clear from the judge's statement that he was aware of this trade-off, and that he relied on the fact that the chosen restraints were relatively inconspicuous and minimally restrictive.

### 3. Other Grounds

The remaining grounds asserted by the petitioner both on appeal and collateral review were carefully considered by the District Court and are without merit.

■ Petitioner's second claim is that his motion for acquittal should have been granted because the "prior calculation and design" element of aggravated murder was not proven. The state appellate court found that the jury had ample evidence of the presence of sufficient time and opportunity before the firing of the fatal shot upon which to base a finding of prior calculation. Petitioner is not entitled to habeas relief if the record shows that a rational factfinder could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ Petitioner's third claim is that the grand jury was not properly empaneled. The state appellate court rejected this contention as a matter of fact. Moreover, petitioner had available an opportunity to raise this claim prior to trial and did not do so. Where the state provides an opportunity for full and fair litigation the petitioner may not be granted habeas relief. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Petitioner's related assertion of error, that the number of grand jurors did not satisfy the statutory requirements set by the legislature as it was mandated to do by the state constitution, does not raise a federal constitutional claim.

Petitioner's fourth claim is that there was an unlawful search and seizure. The petitioner could have but did not raise this claim prior to trial. Moreover, the state appellate court found as a matter of fact that removal of the weapon from Brofford's vehicle was not a search. Under *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), where the state provides an opportunity for full and fair litigation of a fourth amendment claim, habeas relief will not be available.

■ Petitioner's fifth claim is that the trial judge's instruction to the jury, in defining the lesser included offense of murder as aggravated murder absent prior calculation and design, focused the jury's attention on the more serious charge and was therefore erroneous. The state appellate court found no error in the instruction. Petitioner's ground for claiming that the instruction was erroneous is insufficient to impugn the fundamental fairness of the trial. The instruction must so infect the

---

record" considered "as a whole" intended to authorize broader federal review of state-court credibility determinations than are authorized in appeals within the federal system itself.

*Marshall v. Lonberger,* 459 U.S. at 432, 434–35, 103 S.Ct. at 849, 850–51.

trial that the resulting conviction violates due process. It is not enough that the instruction is undesirable, erroneous or even universally condemned. *Henderson v. Kibbe*, 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977).

Petitioner's sixth claim is that the trial court improperly excluded evidence concerning the propensity for violence of state witness Juanita Runyon. The state appellate court found that Runyon's propensity for violence was neither in issue in the trial nor relevant to her truth and veracity. Issues concerning the admissibility of evidence are state law questions and are not open to challenge on collateral review unless the fundamental fairness of the trial has been so impugned as to amount to a denial of due process. *Bell v. Arn*, 536 F.2d 123 (6th Cir.1976).

Petitioner's last claim involves the admission into evidence of a photograph that was not submitted to the defense prior to trial. The state appellate court found that this photo was prepared as a visual aid to the testimony of a ballistics expert witness, and as such was only demonstrative evidence. Once again, this question is governed by the *Bell v. Arn* standard.

### Conclusion

None of the contentions raised by the appellant being meritorious, the District Court's dismissal of his petition for a writ of habeas corpus is affirmed.

MERRITT, Circuit Judge, dissenting.

The District Court declined to grant an evidentiary hearing on the change of venue and the shackling issues. I respectfully dissent from the opinion of the Court on these issues because I believe we should require an evidentiary hearing on this case. We do not know enough about the facts of the case to determine the issues.

We do not have before us in the record any significant factual development on the change of venue issue except the transcript of the voir dire. The transcript shows that most of the jurors—nine out of twelve—clearly thought the defendant was guilty based upon what they had read and heard about the crime but that no juror raised a hand when asked by the judge if they could not lay those opinions aside. We do not have before us the pretrial publicity itself or any other facts to show the basis for the state court's position or the District Court's refusal to conduct an evidentiary hearing before dismissing the case.

The same is true of the shackling issue. We do not know what the state judge based his decision on except the nature of the crime and the recommendation of the local sheriff. I would require an evidentiary hearing in order to determine whether presenting the defendant to the jury every day in a shackled condition was justified and whether it reinforced the juror's previously stated opinion before hearing the evidence that the defendant was guilty.

Although the facts on the surface strongly suggest that the defendant committed the terrible crime with which he was charged, the state must observe due process in obtaining a conviction. There is a real question about whether due process was observed on the change of venue question and the shackling question. I am unable to apply the law to the facts of this case without knowing in more detail what the facts are.

Whether due process is observed is not a "discretionary" matter with the state court and with the District Court, as our Court's opinion sometimes seems to suggest. We have not adequately performed our review function in this case by simply indulging in the presumption that the state court and the District Court below exercised its discretion appropriately. We do not have a record that permits us to apply the law on change of venue and shackling contained in the cases cited by the court in its opinion.