976 F.2d 733
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
John FRIEDRICH, Petitioner-Appellant,
v.
Walter ECHOLS, Respondent-Appellee.
 No. 91-3929.
 United States Court of Appeals, Sixth Circuit.
 Sept. 22, 1992.
 
 Before MILBURN and SILER, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The petitioner-appellant, John Friedrich, appeals the district court's dismissal of his 28 U.S.C. § 2254 habeas corpus petition. On appeal, Friedrich raises the issues of whether: (1) the district court conducted a de novo review of the record; (2) he was deprived of his right to a speedy trial; (3) he was denied his right to counsel because the prosecuting attorney was allegedly acting as his attorney; (4) he was fully able to present his defense, even though the court would not permit him to call the prosecutor as a witness; (5) the attorney-client relationship was breached when his ballistics expert testified for the state; (6) the jury was biased in light of the alleged prejudicial statements of one juror and pretrial publicity; (7) the results of a non-conclusive polygraph test are admissible under Ohio law; (8) admission of evidence regarding his state of mind denied him a fair trial; and (9) a jury instruction on voluntary manslaughter was warranted. For the reasons stated herein, we AFFIRM the decision of the district court.
 
 
 2
 Friedrich was convicted of murder and a firearms charge in state court and was sentenced to fifteen years to life on the murder charge and three years on the firearms charge. Friedrich was a friend of the victim and her family. The victim and Friedrich shared a common belief in reincarnation and the occult. When Friedrich became depressed and delusional due to "diagnosed" demonic possession, the victim would assist him.
 
 
 3
 In 1986, Friedrich became extremely despondent because his wife was unattractive, they had a baby girl instead of a baby boy, and he earned an insufficient income. Shortly before the victim's death, she told her friend, Ivory Sinclair, that she had spoken earlier with an angry and troubled Friedrich. At trial, Sinclair testified as to the entire conversation, stating that the victim wanted to help Friedrich, who she felt was painfully harming his body. At some unknown time, the victim stated that Friedrich was a snarling animal. The victim also wrote a letter, stating virtually the same thing as was said in the telephone conversation with Sinclair.
 
 
 4
 Shortly after this conversation, the victim was gruesomely murdered. Four days after the murder, Friedrich telephoned the prosecutor, Thomas White, who had served as his workers' compensation attorney in 1984, and requested a personal meeting. Unknown to Friedrich, the conversation was recorded. Subsequently, Friedrich met with White and Captain Pennell of the Holmes County Sheriff's office. During this recorded conversation, White indicated that Friedrich did not have to speak unless he so desired.
 
 
 5
 Friedrich was indicted for aggravated murder with a firearm specification, see Ohio Rev.Code § 2903.01(A), and a trial was scheduled for August 19, 1986. However, on August 6, 1986, Friedrich filed a motion to disqualify White, which resulted in the trial's continuation. After the Ohio Court of Appeals affirmed the trial court's denial of this motion, the Ohio Supreme Court denied review of the appellate court's decision, and on February 22, 1988, the United States Supreme Court denied certiorari.
 
 
 6
 On March 1, 1988, Friedrich's trial began. Friedrich subpoenaed White as a witness, but the trial court granted a motion to quash the subpoena. White called Friedrich's ballistics expert, who testified that Friedrich's firearm matched one projectile from the victim's body.
 
 
 7
 The events surrounding the murder and the trial were publicized. Much of the publicized information came from the bailiff of the court who moonlighted as a newspaper reporter. Just after the trial began, the judge was informed by the bailiff that a juror, Eugenia Wolboldt, had made prejudicial statements about Friedrich. However, the judge neither informed the parties of these statements, nor questioned Wolboldt regarding them.
 
 
 8
 On April 1, 1986, Friedrich took a non-conclusive polygraph test, which the court refused to admit into evidence. The court also rejected Friedrich's proffered jury instruction on voluntary manslaughter. Friedrich was convicted of murder together with a firearm specification, a lesser included offense. See Ohio Rev.Code § 2903.02. Friedrich unsuccessfully appealed his conviction to the Ohio Court of Appeals and unsuccessfully sought review from the Ohio Supreme Court. Friedrich then petitioned the Court of Common Pleas, Holmes County, Ohio for post-conviction relief, which the court overruled, noting that the claims presented should have been raised on direct appeal.
 
 
 9
 Thereafter, Friedrich filed a 28 U.S.C. § 2254 petition for habeas corpus relief. Over Friedrich's objection to the United States Magistrate Judge's ("Magistrate") recommendation that Friedrich's petition be dismissed, the district court adopted the Magistrate's recommendation, whereupon Friedrich unsuccessfully moved for a new trial.
 
 I.
 
 10
 28 U.S.C. § 636(b)(1) provides that "a judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." The district judge need not state his rationale for disposing of the Magistrate's Report, so long as he reviews the case de novo. Roland v. Johnson, 856 F.2d 764, 769 (6th Cir.1988).
 
 
 11
 The Magistrate reviewed the transcript from Friedrich's state trial and concluded that the Ohio Court of Appeals' statement of the facts was accurate. The district court "reviewed the record, including a reading of the entire trial transcript, the [M]agistrate's report and [Friedrich's] objections...." (emphasis added). Such a review constitutes a de novo review. Accordingly, Friedrich's claim is without merit.
 
 II.
 
 12
 The following four factors must be considered in determining whether a defendant was denied a speedy trial: (1) the length of delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial;[1] and (4) the prejudice to defendant.[2] Barker v. Wingo, 407 U.S. 514, 530-31 (1972). A speedy trial requires the trial court to make "a diligent good-faith effort" to promptly try the defendant. Cain v. Smith, 686 F.2d 374, 382 (6th Cir.1982).
 
 
 13
 When Friedrich's motion to disqualify White was unsuccessful, he ultimately appealed to the United States Supreme Court. While this appeal was pending, the trial court ordered that discovery be taken. However, Friedrich contested the discovery order, asserting that only the Supreme Court had jurisdiction while the appeal was pending. The trial court also attempted to dispose of all pretrial matters prior to resolution of Friedrich's appeal.
 
 
 14
 Friedrich caused the lengthy delay with his appeal, and rather than assert his right to a speedy trial, he objected to the efforts of the court and White to move the case along. Friedrich was released on bail following his arrest and remained free until after conviction. Any anxiety which he suffered resulted from his own tactics. Accordingly, Friedrich was not denied a speedy trial, as the delay was solely his fault.
 
 III.
 
 15
 Friedrich incorrectly contends that the recorded conversations were admitted into evidence and used to convict him. The recordings were mentioned only in passing during cross-examination. The trial transcript clearly indicates that Friedrich knew the role which White was playing and that any attorney-client relationship had ended in 1984. Friedrich did not present a contract indicating a continuing attorney-client relationship, nor did he present any other evidence, other than his bare assertion that there was a continuing attorney-client relationship. Accordingly, Friedrich was not denied his right to counsel.
 
 IV.
 
 16
 As evidence of White's conversations with Friedrich were not admitted at trial, there was no reason for White to testify. Friedrich was provided with a copy of the transcript. Moreover, Pennell testified at trial and had more information about the events culminating in Friedrich's indictment. Friedrich failed to show what evidence White could have provided that Pennell did not. Therefore, he was not denied his constitutional right to present a defense.
 
 V.
 
 17
 Third parties providing non-legal services cannot benefit from the attorney-client privilege. See Hickman v. Taylor, 329 U.S. 495, 508 (1947). The court instructed the expert not to disclose privileged matters, with which he complied. Therefore, there was no breach of the attorney-client privilege.
 
 VI.
 
 18
 Friedrich had the burden of proving that he was denied a fair trial because of jury bias. Goins v. McKeen, 605 F.2d 947, 951 (6th Cir.1979). The situation regarding Wolboldt's alleged statements are sufficiently analogous to cases involving juror opinions formed from pretrial publicity that the discussion of this issue will focus on such cases.
 
 
 19
 In Irvin v. Dowd, 366 U.S. 717 (1961), the Supreme Court vacated a state capital conviction due to juror bias based on pretrial publicity. The Court noted that "important case[s] can be expected to arouse the interest of the public in the vicinity" and most jurors will have "formed some impression or opinion as to the merits of the case." Id. at 722. The Court held that
 
 
 20
 [t]o hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression and render a verdict based on the evidence presented in court.
 
 
 21
 Id. at 723 (emphasis added). The Court noted that before evidence was presented, eight out of twelve jurors thought that the defendant was guilty. Id. at 727-28.
 
 
 22
 Irvin was distinguished in Patton v. Yount, 467 U.S. 1025 (1984). Holding that the pretrial publicity did not bias a juror, the Court stated that the partiality of a juror "is plainly a question of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." Id. at 1036. Accordingly, the Court held that such a determination by a state court was entitled to a presumption of correctness. See 28 U.S.C. § 2254(d). The Court rejected a challenge to a statement similar to the one alleged herein, noting that such statements are common, and the trial judge took adequate precautions to ensure that the juror could be impartial. Patton, 467 U.S. at 1039-40.
 
 
 23
 In Brofford v. Marshall, 751 F.2d 845 (6th Cir.1985), this court engaged in an exhaustive analysis of juror bias. In Brofford, the juror stated in voir dire that he could set aside his opinion that the defendant was guilty only if evidence differing from that reported in the newspapers was presented. Id. at 848. After discussing the similarities between Irvin and Brofford, the court stated that such analysis is not controlling because each case must be decided on its facts. Id. at 851.
 
 
 24
 The court further noted that Irvin differed from Patton, in that Irvin was a capital case, whereas Patton was not. Id. at 850 n. 1. However, the court cautioned that such a distinction may be problematic. Id. (citing Groppi v. Wisconsin, 400 U.S. 505 (1971) (state law barring change of venue in misdemeanor cases regardless of local prejudice violates right to trial by impartial jury)). Accordingly, although we do not find the capital versus noncapital distinction to be controlling, we do believe it to be persuasive.
 
 
 25
 This case is more analogous to Patton and Brofford. With respect to the pretrial publicity, the state trial judge was satisfied that the jurors could lay aside any preliminary opinions as to Friedrich's guilt or innocence. This finding is reversible only if manifest error is found. Patton, 467 U.S. at 1031-32 n. 7 (Patton distinguished between those cases involving the bias of the jury as a whole, for which the manifest error standard applied, and those involving the bias of an individual juror, which it deemed a factual finding entitled to the 28 U.S.C. § 2254(d) presumption of correctness.).[3] It does not appear that there was a "barrage of inflammatory publicity immediately prior to trial," Murphy v. Florida, 421 U.S. 794, 798 (1975), which resulted in a "huge wave of public passion." Irvin, 366 U.S. at 728. Therefore, because the trial court did not manifestly err, we affirm the decision of the district court as to the bias of the jury as a whole.
 
 
 26
 At the hearing on the motion for a new trial, conflicting evidence was presented as to the meaning of Wolboldt's alleged statements. The information the trial judge received during trial was later found to be incorrect, but he made little inquiry about it when he learned of it. The bailiff told the judge that she heard that the night before jury selection began, juror Wolboldt was in a bar and told someone, "John Friedrich is as guilty as hell and they ought to hang the sonofabitch." By the time the judge heard of this alleged statement, Wolboldt had already been qualified and seated as a juror. During voir dire, she said she could render a fair and impartial verdict both for the state and the defendant. She also said that she had read "very little" about the case, had not talked about it with anyone, knew nothing about it, and had no preconceived idea about the case or whether the defendant was innocent or guilty.
 
 
 27
 At the hearing on the motion for a new trial, under the best evidence for the defendant, a statement had been made by Wolboldt, but it was made at a beauty/exercise shop in a woman's home, not at a bar. Moreover, it was made one or two weeks, not the day, before trial. Finally, the women who heard the statements said Wolboldt was discussing the case and hoped to get picked on the jury. When asked why she wanted to be on that jury, she was supposed to have said, "Guilty, guilty, guilty," and "He's guilty." When Betsy "Moose" Miller asked her how she could sit on the jury thinking that, Wolboldt was supposed to have said, "I will just lie. I will tell them I don't know nothing about it."
 
 
 28
 Although the Magistrate Judge did not make a formal finding that Wolboldt made the alleged statements, Wolboldt indicated that she might have made some statements jokingly which were not directed at Friedrich. The testimony of Wolboldt and others who overheard the alleged statements may best be described as conflicting and ambiguous.
 
 
 29
 During voir dire, Wolboldt stated that she could be fair. Moreover, two other jurors testified that during deliberation Wolboldt did not indicate any prejudice toward Friedrich, but instead inquired about the testimony of the witnesses for the state, examined the exhibits, and did not rush to a judgment. "While the cold record arouses some concern, only the trial judge could tell which ... answers were said with the greatest comprehension and certainty." Patton, 467 U.S. at 1040. Finally, Betsy Miller also said that two days after the trial was over, Wolboldt told her she didn't think Friedrich was guilty.
 
 
 30
 The state trial judge found Wolboldt was not biased as a juror and this finding was adopted by the Ohio Court of Appeals. Therefore, because Friedrich has failed to present evidence sufficient to overcome the presumption of correctness, see 28 U.S.C. § 2254(d) (state court factual findings entitled to presumption of correctness unless one of eight exceptions apply),[4] we find that Friedrich received a fair trial.
 
 VII.
 
 31
 The admission of polygraph results is left to the sound discretion of the trial court. Wolfel v. Holbrook, 823 F.2d 970, 972 (6th Cir.1987), cert. denied, 484 U.S. 1069 (1988). Polygraph results are admissible if they corroborate a party's testimony. See State v. Souel, 372 N.E.2d 1318 (Ohio 1978). The examiner concluded that the test results were "inconclusive, the same as no test being given at all." Thus, the results had no corroborative value, so the trial court did not abuse its discretion.
 
 VIII.
 
 32
 A state trial court's application of evidentiary principles is not reviewable in a federal habeas corpus action unless the accused was denied due process. Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir.1988). In addition to Sinclair's testimony, the state presented substantial other evidence implicating Friedrich in the crime, negating the necessity of Sinclair's testimony for a conviction. Therefore, Friedrich was not denied his confrontation rights or a fair trial.
 
 IX.
 
 33
 If the highest court of a state finds a defendant's request for an instruction on a lesser included offense to be unwarranted by the evidence, a federal court will overturn the decision only under extraordinary circumstances. Bagby v. Sowders, 894 F.2d 792, 795 (6th Cir.), cert. denied, 110 S.Ct. 2626 (1990). The Ohio Court of Appeals upheld Friedrich's conviction, and the Ohio Supreme Court denied review of his claims. As Ohio's highest court has implicitly ruled on this issue in this case, Friedrich's claim is not reviewable because extraordinary circumstances do not exist. Id. at 797 (The failure to instruct on a lesser included offense in noncapital cases is not "such a fundamental defect as inherently results in a miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure.").
 
 
 34
 For the aforementioned reasons, we AFFIRM the decision of the district court in denying the writ.
 
 
 
 [1]
 The timeliness, vigor, and frequency with which a defendant has asserted his speedy trial right should be considered. Cain v. Smith, 686 F.2d 374, 384 (6th Cir.1982)
 
 
 [2]
 In determining whether the defendant was prejudiced by the delay, three factors are considered: (1) oppressive pre-trial incarceration; (2) anxiety and concern; and (3) impairment of the defense. Barker v. Wingo, 407 U.S. 514, 532 (1972)
 
 
 [3]
 A finding of manifest error and a presumption of correctness appear to be virtually the same standards. Patton, 467 U.S. at 1031-32 n. 7
 
 
 [4]
 Because the question of individual juror bias is "essentially one of credibility [and demeanor]," see Patton, 467 U.S. at 1038, the presumption of correctness applies in all such cases, regardless of whether the juror is questioned concerning the alleged statements during voir dire, or at a later time